IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 2, 2011 Session

**STEVEN RAY THACKER v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Dyer County**
**No. C00-54      Allen Wallace, Senior Judge**

_____

**No. W2010-01637-CCA-R3-PD  - Filed March 23, 2012**

_____

A Lake County jury convicted the Petitioner, Steven Ray Thacker, of first degree murder and sentenced him to death. On direct appeal, the Tennessee Supreme Court affirmed both the conviction and sentence. *See State v. Thacker*, 164 S.W.3d 208 (Tenn. 2005). The Petitioner filed a pro se petition for post-conviction relief, and the post-conviction court appointed counsel. Following an evidentiary hearing, the post-conviction court dismissed the petition. On appeal, the Petitioner contends that: (1) he received the ineffective assistance of counsel during his trial; (2) he received the ineffective assistance of counsel on appeal; (3) the sentence of death violates his constitutional rights; (4) the aggravating circumstances of his case do not preclude a finding that he was prejudiced by his trial counsel's performance; and (5) he is entitled to post-conviction relief based upon the cumulative effect of counsel's errors. After a thorough review of the record and applicable authorities, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JERRY L. SMITH and CAMILLE R. MCMULLEN, JJ., joined.

Donald E. Dawson and Kertyssa Austin, Nashville, Tennessee, for the appellant, Steven Ray Thacker.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; and C. Philip Bivens, District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

## A. Procedural History

On December 23, 1999, the Petitioner kidnapped, raped, and killed Laci Dawn Hill in Oklahoma.[1]  He used credit and debit cards that he had stolen from Hill to purchase Christmas presents for his family.  Concerned that authorities were looking for him, the Petitioner fled to Missouri where he car-jacked a grandmother, a mother, and a child.  He pushed the mother out of the vehicle and later let the grandmother and the child go.  The Petitioner evaded authorities by hiding in the woods for a few days and breaking into homes.  During one of the burglaries, Forrest Boyd, the homeowner, returned to the home, and the Petitioner killed him.  The Petitioner fled in Mr. Boyd's vehicle to Dyersburg, Tennessee, where the vehicle broke down.  A tow truck driver, Ray Patterson, came to the Petitioner's aid, and, after Patterson learned that the Petitioner was attempting to pay with a stolen credit card, the Petitioner killed Patterson.  The Petitioner gave a statement to a Dyersburg police officer admitting that he killed all three victims.

A Lake County jury convicted the Petitioner of first degree murder for killing Patterson and, after a sentencing hearing, imposed a sentence of death.  On direct appeal, the Tennessee Supreme Court affirmed both the conviction and sentence.  *See State v. Thacker*, 164 S.W.3d 208 (Tenn. 2005).

On December 12, 2005, the Petitioner filed a *pro se* petition for post-conviction relief, and the post-conviction court appointed counsel.  Following an evidentiary hearing, the post-conviction court entered an order on July 2, 2010, denying post-conviction relief.  The Petitioner filed a timely notice of appeal on July 30, 2010.

## B.  Trial and Sentencing

The evidence presented during Petitioner's trial was summarized by the Tennessee Supreme Court as follows:

> The [Petitioner], Steven Ray Thacker, was convicted of first degree premeditated murder and felony murder for the death of Ray Patterson.[2]  The State's proof at trial established that on January 2, 2000, an automobile being driven by the [Petitioner] broke down just east of the Mississippi River as he

---

[1] Following Petitioner's trial in Tennessee, Petitioner pled guilty to first degree murder, kidnapping, and first degree rape in Oklahoma and was sentenced to death. *See State v. Thacker*, 100 P.3d 1052 (Okla. Crim. App. 2004).

[2] The convictions were subsequently merged into a single conviction.

was traveling from Springfield, Missouri towards Dyersburg, Tennessee. The [Petitioner] received a ride from an unidentified male to the Northside Truck Stop in Dyersburg. The [Petitioner] asked the cashier at the truck stop, Melissa Atkeson, if she knew of a wrecker service that was open on Sundays. Atkeson provided the [Petitioner] with the name and telephone number of Ray Patterson, a local wrecker operator. The [Petitioner] called Patterson and then waited at the truck stop until the wrecker arrived.

Elizabeth Patterson, the victim's wife, remembered her husband receiving a telephone call at home on the morning of January 2, 2000. After taking the call, Patterson wrote "Oldsmobile Cutlass, '85, pull to Auto Zone store" on an envelope, then told his wife to continue on to church with their children and he would join them later if possible. When the victim left home that morning, he carried a .25 caliber semi-automatic pistol in his pocket, which, according to Mrs. Patterson, was not unusual for her husband to do when answering calls for a wrecker. He also carried a pocket knife, his wallet, money, and a pack of cigars.

Curtis Hinson, an employee of Triple-A Taxi in Dyersburg, saw the victim and another man in the victim's wrecker that morning. As Mr. Hinson was traveling on Lake Road, the victim's wrecker passed by, traveling in the opposite direction. Hinson observed that the victim was driving, another man was riding as a passenger, and the wrecker was towing a vehicle. Also that morning, a maintenance worker at the Dyersburg welcome center, Thomas Burns, saw the victim accompanied by another man at the welcome center. Later that afternoon, Burns learned that Mr. Patterson had been killed, and he saw the [Petitioner's] picture in the newspaper. Burns recognized the [Petitioner] as the same man he had seen with Mr. Patterson at the welcome center that morning.

Wyman Brasfield, a wrecker driver for Brasfield's Body Shop, passed by Patterson Brothers' Service Station during the morning of January 2, 2000, and noticed the victim standing inside the building with his back to the window. Brasfield also noticed another person, whom he could not identify, standing inside the building with the victim. The victim's wrecker, with a car attached to it, was parked outside the station lot. Later that day, Mr. Brasfield received a call to tow a vehicle at the residence of Tim Capps, a local mechanic. Upon arriving at Capps' residence, Brasfield recognized the vehicle to be towed as the same one that had been hooked to the Patterson wrecker earlier in the day. The [Petitioner] later admitted to police that he had traded

3

vehicles at Mr. Capps' repair shop on that day.

Kenneth Campbell and Emily Guinn had been on their way to church the morning of January 2, 2000, when they stopped at Patterson Brothers' Service Station to buy a drink. When Mr. Campbell got out of his vehicle he noticed a person walking towards him but thought nothing of it. However, as he was attempting to get a soda from the drink machine, he saw the victim lying on the ground between the gas pumps and the office. Mr. Campbell immediately got back into his vehicle and left to find a telephone and call the police. He circled the block and, as he neared the service station again, he noticed "someone dragging the body near the roll-up door of the gas station." Mr. Campbell then drove directly to the police station to report what he had seen.

Tina Canada, the manager of B&B Market at Big Boy Junction in Dyersburg, recalled that on that same Sunday morning, a man came into the store to purchase antifreeze. The man asked an elderly gentleman in the store, Sam Brown, whether there was an outside water faucet. He also asked Mr. Brown for directions to Auto Zone and then left the store, heading back toward town. According to Ms. Canada, the man was calm and "just concerned about getting his car fixed." She could not, however, identify the [Petitioner] as being the man in the store.

At approximately 12:20 p.m. that day, the [Petitioner] entered the Auto Zone in Dyersburg and approached a customer in the store, Mr. Paul Gage. The [Petitioner] asked Mr. Gage if he knew of "a place to get a car worked on." Mr. Gage referred him to Tim Capps and told the [Petitioner] that Capps' repair shop was located behind Webb's Used Cars. The [Petitioner], in a statement [he] later gave to police, described how he drove from Auto Zone to Capps' shop. When he was informed that it would take several days to repair his vehicle, the [Petitioner] traded his vehicle to Capps for a red Chevrolet Camaro. However, the Camaro had mechanical problems, so the [Petitioner] returned it in exchange for a Pontiac 6000.

By this time, police had discovered the victim's body at Patterson Brothers' Service Station and had begun their investigation. Officer David Fisher of the Dyersburg Police Department was the first officer on the scene. Officer Fisher discovered the victim lying in the first service bay of the service station. A trail of blood led from the first fuel pump island directly to the body. According to Officer Fisher, the victim was dressed in an "ordinary

4

service-station-type uniform" and "his inner shirt was torn, and the jacket and shirt, around the collar area, was pulled backwards, as if he'd been dragged to the location that he was found." Officer Fisher also observed a "substantial" wound to the victim's upper torso.

Two EMT's with the Dyersburg Fire Department, Jerry Walker and Ronnie Collins, arrived at the scene shortly thereafter. Mr. Walker examined the victim for vital signs but found none. Upon opening the victim's shirt, he observed a wound "in his shoulder, coming down, it looked like. It looked like a knife wound." No other wounds were discovered by Walker. A paramedic at the scene, Tony Douglas, also examined the victim and discovered "a puncture wound on the right side of the chest somewhere around two to three inches long and in a moon-shape." Mr. Douglas believed that this wound was fatal and that the victim had died from "bleeding out" because "he'd lost a lot of blood." He found no other wounds on the victim. Mr. Douglas admitted, however, that he did not know for certain the cause of death.

Investigator Jim Joyner was the first detective to arrive at the service station. He observed a very large amount of blood at the scene, recalling that "blood was all over the station, out in the front, in the service bay, in the office" and the victim's clothing was "saturated with blood." Additionally, there was a large blood splatter from the cash register to the wall of the office. Investigator Joyner stated that the blood trail went out the door of the office toward the service bay door. A Discover credit card in the name of Forrest R. Boyd was found on the counter next to the credit card machine. Neither the victim's gun nor his wallet were found, and the Patterson wrecker was missing from the service station.

Following up on the Discover credit card found at the scene of the crime, investigators contacted the Sheriff's Department in Polk County, Missouri. They were able to verify that the person who owned the card, Forrest Boyd, was a resident of Polk County and was not in Dyer County, Tennessee. Also, Boyd had not given permission for anyone to possess or use his card in Dyer County. Polk County Sheriff Mike Parson advised the Tennessee investigators that the [Petitioner], Steven Ray Thacker, may have been in possession of the credit card and also Mr. Boyd's vehicle, which Sheriff Parson described as a "1985 Oldsmobile Cutlass, burgundy in color" bearing the license plate number 540JBJ.

After receiving this information pointing to the [Petitioner] as a possible

suspect, along with a description of the vehicle he might be driving, Investigator Joyner advised other law enforcement personnel to be on the lookout for the vehicle and the [Petitioner]. Later that same day, the Dyer County Sheriff's Department was informed by Tim Capps that the suspect had traded vehicles and was possibly driving a cream colored 1984 Pontiac 6000. The Union City Police Department subsequently located both the vehicle and the suspect at the Super 8 Motel in Union City.

Derrick O'Dell, a patrol officer with the Union City Police Department, responded to information that the suspect vehicle was at the Super 8 Motel. Upon arriving at the motel, Officer O'Dell observed a white male exiting the building carrying two Wal-Mart bags and walking towards a dumpster. Officer O'Dell approached and questioned the man, who identified himself as "George" and stated that he was from Florida. When a second officer arrived, however, the man was identified as the [Petitioner], Steven Thacker. The officers then transported the [Petitioner] to the Obion County Jail.

Investigator Joyner, along with Investigator Monty Essary, searched the [Petitioner's] room at the Super 8 Motel pursuant to a warrant. They recovered several items belonging to the victim, including credit cards, a .25 caliber semiautomatic pistol, hair dye, and numerous other items. On the bed, the officers discovered two knives. Also, a green Carhartt coat and a brown coat were seized from the room and sent to the Tennessee Bureau of Investigation (TBI) for analysis. Some of the items found in the room were bloodstained.

Investigator Essary accompanied the victim's body to the Methodist Hospital morgue, where he removed the victim's clothing, including two bloodstained shirts. This clothing was bagged and sent to the TBI Crime Lab for analysis along with a blood sample obtained from the defendant. In addition, investigators located a red Pontiac Firebird at Tim Capps' business that was one of the vehicles the [Petitioner] had driven. Inside the Pontiac, investigators found a Buck brand five-and-one-half-inch knife with blood on it. This knife was also forwarded to the TBI Crime Lab. The Crime Lab report subsequently revealed that the DNA obtained from the blood on the victim's shirt matched the DNA from blood found on the knife, the Carhartt coat, and the [Petitioner's] boots, which had also been recovered from his hotel room by investigators.

The [Petitioner] was taken from the Obion County Jail to the Dyersburg

6

Police Department where, upon being advised of his rights, he voluntarily provided a statement to authorities. In his statement, the [Petitioner] detailed his actions leading up to and following the victim's death.

The [Petitioner] related how he had left his home in Chouteau, Oklahoma, on about December 28, 1999, and traveled to Springfield, Missouri. He left Springfield on December 31 and traveled toward Dyersburg, Tennessee, but his car broke down "two-and-a-half miles this side of the Mississippi River." An unidentified man gave the [Petitioner] a ride into Dyersburg and dropped him off at a truck stop. While at this truck stop, the [Petitioner] called the victim and asked him to tow his vehicle into the service station. Once they arrived back at the victim's service station, the [Petitioner] attempted to pay the victim with the stolen credit card, but the card was rejected. According to the [Petitioner], "he wasn't gonna give my credit–my card back 'cause I couldn't pay the bill. . . . And I knew I was wanted in other states, so I just stabbed him and took off." He explained that the victim had been facing the credit card machine when the [Petitioner] stabbed him but immediately turned around and attempted to pull out his gun. However, the [Petitioner] managed to elude him by hiding behind a truck parked inside the garage. The victim then ran out into the parking lot towards the tow truck and collapsed on the ground. At that point, the [Petitioner] drove the wrecker off the property and into some nearby woods so he could remove his vehicle from the back of the wrecker. The [Petitioner] then returned to the service station, dragged the victim's body back into the building and took the victim's wallet and gun.

The [Petitioner] explained how he later traded the Oldsmobile Cutlass that he was originally driving for a red Camaro, but that the Camaro had mechanical problems so he returned it in exchange for the Pontiac 6000. The [Petitioner] said that the knife he had used to stab the victim was probably in either the Oldsmobile or the Camaro. Shortly after the murder, the [Petitioner] went to a local Wendy's restaurant for a sandwich and then drove to Union City where he checked into the Super 8 Motel. The [Petitioner] stated that his plan had been to go camping in the Smoky Mountains, and he admitted to having stolen some camping gear and the knife from Mr. Boyd along with the Oldsmobile.

Based upon the foregoing, the jury found the [Petitioner] guilty of first degree premeditated murder and felony murder in the perpetration of a theft.

7

. . . .

During the penalty phase of the trial, Polk County Missouri Sheriff Mike Parson testified that on January 2, 2000, there were warrants outstanding for the arrest of the [D]efendant. Jim Porter, a criminal investigator with the Dyersburg Police Department, recounted how the [Petitioner] had stated during questioning that he "knew [he] was wanted in other states, so [he] just stabbed [the victim] and took off."

Elizabeth Patterson, the victim's widow, stated that she and the victim had been married for thirty-five years at the time of his death and that the couple had three adult children. Mrs. Patterson explained that her husband was her sole source of financial support prior to his death. Since his death she had had no income, and was forced to borrow money to pay burial expenses. She had also needed to borrow money to support herself until she received insurance proceeds. She stated, "I lost my best friend and companion. And I can't sleep at night in my bed. I sleep on my couch." She described her husband as "a good man. . . a good Christian man," and related how her husband would sometimes tow vehicles for free. Mrs. Patterson also stated that her husband earned approximately $15,000 per year at the service station and that she had received $250,000 from her husband's life insurance policy.

In mitigation, the [Petitioner] offered the testimony of Kimberly Bowen, a resident of Huntington, West Virginia, who lived with the [Petitioner] from 1994 until 1997. She described the [Petitioner] as follows:

> Steve made me laugh a lot. He was very, very tender with me and my kids. Probably the best example would be when he went into construction and would be gone for a week or two at a time, he would plant notes throughout the house, 'cause he knew that I'd go into the bill drawer to pay bills one day and there'd be a little note letting me know that he missed me, or, you know, in the laundry room. It didn't really matter, you know, just little spots that he would have little notes to remind me of him.

She further described the [Petitioner] as selfless and related how he had once aided flood victims in Milton, West Virginia. Ms. Bowen stated that it seemed like the [Petitioner] was always "seeking approval." However, she also described periods during which the [Petitioner's] behavior changed. According to Bowen, "maybe twenty percent of the time [the Petitioner] would

8

get revved up and be–he wouldn't be Steve." She recounted how this behavior gradually affected their relationship to the point where she thought they needed to seek help in order to stay together. Thereafter, Ms. Bowen and the [Petitioner] went to a mental health facility in Huntingdon, West Virginia, where the [Petitioner] was diagnosed as having bipolar disorder and was prescribed lithium.

Ms. Bowen stated that the medication appeared to work. She recalled, however, one episode of manic behavior by the [Petitioner] occurring after he forgot to take his medication while on a trip out of town. According to Ms. Bowen, the [Petitioner] "ended up in Columbus, trying to get back, and he kept missing the turnoff on the Columbus loop . . . and he kept going faster and faster. Finally, they stopped him at 140 miles an hour." Ms. Bowen adamantly denied that the [Petitioner] used alcohol or illegal drugs or that he ever exhibited any violent behavior. When asked about the murder in Tennessee, Ms. Bowen stated that it was not the act of the Steve Thacker she knew and described it as "so polar opposite. It's frightening."

On cross-examination, Ms. Bowen admitted telling an investigator that the [Petitioner] suffered severe mood swings. She explained that the [Petitioner] had periods of depression during which he would "get revved up" and exhibit manic behavior. She associated these periods of depression or "revving" as accompanied by spending sprees and "the need for sex." During his "highs," however, the [Petitioner] would seek approval from others. Bowen further stated that, at some point, the [Petitioner] voluntarily stopped taking his medication. Their relationship eventually ended because, according to Ms. Bowen, "it was a wear on me to always be . . . the stable, you know, home base, if you will. I always felt like I was somehow responsible for Steve's ability or inability to act correctly within society."

Also testifying for the [Petitioner] was Crystal St. Clair, a resident of Huntington, West Virginia, who first me the [Petitioner] in 1993. Mrs. St. Clair said that the [Petitioner] was one of her best friends and described him as "a caring, giving person." She added that "he basically got along with most anyone" and that the [Petitioner] would "try to keep trouble down rather than create trouble." Mrs. St. Clair thought highly enough of the [Petitioner] to trust him with her children. She acknowledged that when the [Petitioner] left West Virginia in 1997, she lost contact with him, although they would "periodically touch base with each other." Mrs. St. Clair also admitted that she was aware of the [Petitioner's] bipolar disorder, as well as his decision to stop

9

taking his medication.

Roxanne Evans, the [Petitioner's] paternal aunt, also testified for the [Petitioner]. She testified that the [Petitioner's] father had been in the Air Force and was transferred to Spain when the [Petitioner] was two years old. When the [Petitioner] was four years old, his parents separated and eventually divorced, and his father gained custody of the [Petitioner] and his two sisters. The [Petitioner's] father later remarried, and his new wife had difficulty dealing with the children. Ms. Evans said that on one occasion the children's new step-mother "literally packed their clothes, sat them on the porch, and when my brother came home from work, told him either the children left, or she left." The [Petitioner] and his siblings were taken by their father to their grandparents' house. From that point on, the [Petitioner] developed and maintained a close relationship with his grandfather, but he had little contact with his mother.

Ms. Evans recalled that as a child the [Petitioner] was quiet and introverted. She added that the [Petitioner] was very "affectionate" and that he seemed "hungry for acceptance, hungry for attention." When asked if she had ever seen the [Petitioner] exhibit any violent behavior, Ms. Evans answered "no." She concluded by stating:

> He's a very loving and caring person. He has a problem, and I believe that in a controlled situation that he could live a semi-productive life, and I believe that somehow God could use his talents. He's an extremely gifted artist. I believe that God could use his talents maybe to touch someone somewhere, even if it is in a prison.

The defense then presented Dr. Keith Allen Caruso, a forensic psychiatrist. Dr. Caruso had interviewed the [Petitioner] on July 17, 2001 and had also reviewed documents relating to the [Petitioner's] case. Based on the information he gathered, Dr. Caruso diagnosed the [Petitioner] with a "number of conditions" including bipolar disorder, commonly known as manic depression. Dr. Caruso described this condition as "a mood disorder where someone's emotional state may cycle from depression, where someone's sad . . . very tired . . . unable to sleep and may think about suicide." Dr. Caruso explained that "from a depressive episode, they may cycle up to a manic or hypomanic episode where they're very excitable, . . . irritable, . . . impulsive and not think through the consequences of their actions." A person in this

10

state would, according to Dr. Caruso, "have tremendous amounts of energy and feel very agitated." Their mind would race and "jump from one thought to the next, to the next, to the next." Dr. Caruso added that "someone may cycle between these episodes, and there may be periods, also, in between that they may return to normal functioning."

Dr. Caruso related that the [Petitioner] had a history of alcohol dependence but had been in remission while in confinement. The [Petitioner] also had a history of drug abuse, but again, had been in remission since going through drug rehabilitation as a teenager. Dr. Caruso further stated that the [Petitioner] had a "personality disorder with borderline and antisocial traits." The doctor described persons with this condition as having "problems controlling their behavior and behaving in maladaptive ways." He opined that the [Petitioner's] thoughts "particularly around the time of the offense, were more affected by the bipolar disorder." Dr. Caruso stated, "I think this crime was a convergence of many factors. I think that there are some things dating back to Mr. Thacker's childhood that put him on the path that he would be here today."

Dr. Caruso testified that the [Petitioner's] mental condition could be treated with a "mood-stabilizing medication like lithium." He was also aware that the [Petitioner] had previously been prescribed lithium for his bipolar disorder but had voluntarily stopped taking the medication. According to Dr. Caruso, once the [Petitioner] stopped taking the medication he would become ill again, and the cycling of the mood disorder would continue. He concluded that the [Petitioner] had been suffering a hypomanic episode at the time of the crime and explained:

> Well, I think that bipolar disorder is the severe mental disease. I think, in addition, there was extreme mental or emotional disturbance. In fact, there were a number of stressors, based on Mr. Thacker's history of abandonment and rejection, would again provoke him into a state of extreme emotional disturbance, in addition to the underlying mental disorder that he has, in addition to the bipolar disorder.

Dr. Caruso testified that approximately two percent of the United States' population suffers from bipolar disorder. Approximately "two-thirds to three-quarters" of these persons who take mood-stabilizing medication are able to function normally in society. However, Dr. Caruso stated that a major

11

problem with treating bipolar disorder is that the patients are noncompliant with the medication regimen. Dr. Caruso affirmed that the [Petitioner] had voluntarily stopped taking his medication because he did not like the effect it had on him.

In Dr. Caruso's opinion, the [Petitioner] was competent to stand trial, and a defense of insanity could not be supported in this case. Further, Dr. Caruso stated that he "didn't feel that there was anything here that prevented Mr. Thacker from forming the mens rea for the alleged offenses."

The [Petitioner's] inmate records from Riverbend Maximum Security Institution in Nashville were also introduced. These records revealed that the [Petitioner] had incurred no disciplinary reports during his two years at that facility awaiting trial.

*Thacker*, 164 S.W.3d at 214-20. Following the sentencing hearing, the jury found two aggravating circumstances: (1) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the [Petitioner]; and (2) the murder was knowingly committed by the [Petitioner] while the [Petitioner] had a substantial role in committing, or was fleeing after having a substantial role in committing, a first degree murder, rape, robbery, burglary, theft, or kidnapping. T.C.A. § 39-13-204(i)(6), (7) (1997). The jury also found that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death.

## C. Post-Conviction Hearing

On December 12, 2005, the Petitioner filed a *pro se* petition for post-conviction relief, and the post-conviction court appointed an attorney. The petition alleged that his trial counsel were ineffective when they represented him. As relevant to this appeal, the Petitioner specifically asserted that his trial counsel failed to: (1) request neuropsychological testing; (2) communicate with and prepare Dr. Caruso for his testimony; (3) utilize the services of a mitigation specialist; (4) utilize the defense team in an effective manner; (5) conduct meaningful voir dire and preserve for appeal the denial of various challenges for cause and the denial of a change of venue; (6) present sufficient social history mitigating evidence; (7) present a cohesive theory of defense; and (8) object to and request certain jury instructions.

At a hearing on the petition, the Petitioner's lead counsel ("Counsel") testified that, at the time of the post-conviction hearing, he had been practicing law in Dyersburg, Tennessee, for thirty-nine years and had been involved in seven capital cases, four of which

resulted in a sentence less than death. At one point in his career, Counsel had chaired the Death Penalty Committee of the Tennessee Association of Criminal Defense Lawyers. He had also testified as an expert witness in post-conviction matters in capital cases. During the time period that Counsel represented the Petitioner, seventy percent of his practice was devoted to criminal defense, and he was presently representing defendants in other capital cases.

Counsel testified that, in preparing the Petitioner's defense, he employed the investigative services of Inquisitor, Inc., a company that he had used in similar cases in the past. Counsel stated that there was a miscommunication between him and the investigators about who would conduct the necessary interviews and arrange for the necessary witnesses to appear at trial. Counsel assumed that Ron Lax, the head of Inquisitor, chose which employees would conduct the necessary investigations. Counsel intended to allow Lax to take the lead on investigating the case for the guilt and sentencing phases. Glori Shettles, an employee with Inquisitor, was in charge of mitigation. Counsel said he and Co-Counsel agreed that Co-Counsel would be responsible for preparing the mitigating evidence, so Counsel forwarded any memorandum addressing mitigation to Co-Counsel. While Counsel spoke to Ms. Shettles, he did not recall providing her with direction and stated that he relied upon her to inform him of the information needed.

Counsel testified that the trial court had also appointed another attorney, ("Co-Counsel") to assist in representing the Petitioner. At the time, Co-Counsel and Counsel were partners in the same law firm, and the two agreed Co-Counsel's primary responsibility was to develop defense proof for the penalty phase. Counsel agreed that, as lead counsel, he had a duty to see that Co-Counsel performed the tasks properly. Counsel recalled that, in October 2001, while still representing the Petitioner, Co-Counsel left their law firm. Between that time and the Petitioner's February 2002 trial, Counsel and Co-Counsel did not continue to meet about Petitioner's case.

Counsel recalled that the State made a plea offer that included a sentence of life without parole, and Counsel encouraged the Petitioner to accept the plea offer. The Petitioner agreed to accept the plea only if he was guaranteed that he could remain imprisoned in Tennessee rather than Oklahoma.

Counsel testified that the existence of the Petitioner's charges for murder in both Oklahoma and Missouri created unique problems. The defense did not want to open the door at trial to allow the State to present evidence of the two pending murder charges. During trial, hearings were conducted outside of the jury's presence addressing issues with the other killings.

Counsel testified he sought to change the venue of the Petitioner's case from Dyer County based upon the extensive pretrial publicity of the case, which included the murders in Missouri and Oklahoma. The trial court granted the change of venue and transferred the trial to Lake County. Investigators from Inquisitor conducted a survey of the news media and Lake County citizens regarding their attitudes about the case, and 70% or more of the Lake County citizens had heard about the case. The defense then filed a motion for change of venue from Lake County, believing the Petitioner could not receive a fair trial in Lake County. Counsel were unsuccessful in obtaining a venue change the second time.

Counsel recalled that, leading up to the Petitioner's trial, he and Co-Counsel shared the responsibility of conducting voir dire of the jury. For this process, Counsel retained the services of Julia Fenyes, a jury specialist whom he had used on other cases. Counsel said Fenyes "did a great job" obtaining background information on all of the jurors and creating questionnaires for each juror to complete before trial. Both of these things Counsel found helpful in the jury selection. Counsel testified that, in determining which jurors to keep on the jury,

> you've got to look and see what you've got in the remaining pool from the memorandums and information that you had established with the questionnaires. You've got to go by more things than talk, such as facial expressions, demeanor, whether or not they're going to be a leader or not a leader, what their occupation is. I think a lot of things go into the selection of the juror other than just black and white questions and answers.

When Counsel exercised a peremptory challenge, he was aware of the trial judge's procedure governing which juror would be the replacement and compared that juror to those who were in the jury box. Counsel stated that, although he had some concerns with the jurors who remained on the jury, he believed that those jurors were more favorable to Petitioner than ones who remained in the jury pool. He further said that, in many other cases, he had used all of his challenges and was left with an unfavorable juror that he was unable to challenge. He acknowledged that he had not exercised all of his peremptory challenges in the Petitioner's case.

When Counsel subsequently raised the issue of the change of venue on appeal, the issue was rejected because he had failed to exercise all peremptory challenges. Counsel stated that, in choosing the jury, he was not trying to accomplish a perfect appeal but, rather, tried to choose a jury that would sentence the Petitioner to a sentence less than death. He said he "wasn't thinking about how well it would read on appeal, just to throw jurors off at random to please the appellate court."

14

Counsel testified the theory of defense during the guilt/innocence phase was self-defense based in part upon the fact that the victim always carried a loaded .25 caliber pistol in his pocket. Counsel stated that, although self-defense is not available for a charge of felony murder, "you don't need but–you don't need but one juror to buy your sales pitch and you may get something less than death." Counsel conceded that the Petitioner's redacted statement, which was introduced at trial, reflected that the Petitioner told police officers that the victim produced the gun after the Petitioner had stabbed him. He maintained, however, that the Petitioner had told him a different version than what was included in his statement to police officers. Counsel admitted that he did not foresee that he would not be able to use the version that the Petitioner had related to him without the Petitioner testifying at trial. Counsel stated that, if he could try the case again, he would have encouraged the Petitioner to testify because "[i]t didn't work the first time." Counsel further stated that the chances that the jury would return with a verdict of less than first degree murder were "[s]lim and none."

Counsel testified that he retained Dr. Keith Caruso to evaluate the Petitioner. The only time Counsel spoke to Dr. Caruso, prior to trial, was in the course of securing his services with funds from the state. He said he also employed Dr. David Wilson, but Dr. Wilson's evaluation of the Petitioner was not helpful to Petitioner. Counsel recalled that Dr. Caruso suggested that they also retain a neuropsychologist, but Counsel said he was unable to locate one. Dr. Caruso stated in his report that insanity or diminished capacity could not be supported.

Counsel stated he did not present evidence of diminished capacity in the guilt phase but reserved that evidence for the sentencing phase. In hindsight, however, he thought he should have presented evidence of diminished capacity during the guilt phase rather than waiting to use it in mitigation in an attempt to "humanize" the Petitioner before the jury.

The basic mitigation theme was that the Petitioner suffered from bipolar disorder. Counsel said that, at the time of sentencing, he was not aware whether the Petitioner also suffered from brain damage. Counsel acknowledge that the type of testing he sought for the Petitioner, administered by Dr. Wilson or Dr. Caruso, would not have revealed any such damage.

Counsel testified that, looking back, he believed that Petitioner was on a downward mental slide before he committed the murder for which he was convicted. The investigators interviewed Trena Thacker, the Petitioner's wife, who discussed problems, such as mood swings, that the Petitioner had leading up to the crime spree. The investigators also interviewed Harold Ramos, the Petitioner's coworker, who said the Petitioner was suffering monetary problems before the murders. Ramos reported that he and another employee would

have to pay the Petitioner's motel and food bills when they were working on a job site away from home because the Petitioner never had any money on the Monday after being paid. The investigators also prepared a time line that began in May 1999 when Petitioner was released from prison in Florida. The time line included information about the problems in the Petitioner's life and marriage. Counsel stated that, in hindsight, he believed that the time line illustrated significant issues in Petitioner's life that were relevant to the offense.

Counsel testified that the mitigation evidence presented was "terrible" and that if he had to retry the case, he would not present any witnesses. He stated that Dr. Caruso appeared to be intimidated by the trial judge and the judge's warnings about opening the door to allow the State to present evidence or question witnesses regarding the other two murders. As a result, Dr. Caruso's testimony was "totally ineffective." Counsel said that, while it was his practice not to meet with his experts to discuss the case and their findings before they render their reports, he "should have done that in this case and tried to . . . [get the doctor] not to write such a nice glaring novel for [the prosecutor] to consume [the Petitioner] with."

Counsel stated that, during the penalty phase, the prosecutor used the Petitioner's lay witnesses against the Petitioner and turned them into prosecutorial witnesses. Counsel acknowledged that, during Ms. Bowen's testimony, the State elicited more testimony about the symptoms of bipolar disorder than the defense did. Counsel did not know the amount of time spent preparing Dr. Caruso and the lay witnesses for their testimony during the penalty phase. Counsel did not recall having any contact with the Petitioner's family members but delegated those duties to Co-Counsel.

Counsel testified that Shettles, the mitigation expert, was called as a witness during the penalty phase to show that it would cost more money to execute the Petitioner than it would to keep him in a penal institution for the rest of his life. Counsel explained he filed a motion in limine to keep the State from arguing the costs of incarcerating someone for life because he "didn't want the State to argue it, but [he] wanted to argue it like [he] want[ed] to, that it cost more to execute him than it would be to keep him in prison. [The motion] is just saying that [they] don't want the prosecution to talk about the cost of incarceration." Counsel said the decision to put Shettles on the stand to offer the testimony was made "[i]n desperation" near the end of the mitigation proof. Counsel presented the same argument in another capital case. He believed the evidence would be effective due to comments that he has heard from jurors throughout his career expressing the belief that taxpayers should not have to pay to keep these defendants alive and in the penitentiary for life. Counsel's witness at the other trial testified that the numbers generally show that the cost of execution is considerably higher than the cost of a sentence of life imprisonment. However, in the Petitioner's trial, the prosecutor pointed out that as soon as a defendant is executed, the costs of imprisonment ends.

16

Counsel recalled that, when the jury exited the courtroom to deliberate, the Petitioner expressed concern that the jury would not sentence him to death. Counsel received incident reports on the Petitioner at the jail where he broke a light fixture and cut his hand. The Petitioner also wrote a letter stating that he did not wish to receive any food or medication. Counsel gave the information to Co-Counsel.

Co-Counsel testified that, at the time of the post-conviction hearing, he had been practicing law for twenty years. At the time that he was appointed, Co-Counsel was also representing two other defendants facing the death penalty. In both cases, the death penalty was withdrawn before the trial, and, in one of those cases, the death penalty was withdrawn before the development of the case for trial.

Co-Counsel testified that when he and Counsel were initially appointed to represent Petitioner, they were partners, but their partnership ended a few months into the Petitioner's case. Before they ended their partnership, Counsel and Co-Counsel met at their office and discussed the case on a regular basis. Co-Counsel said he performed more work on the case and was more involved in the day-to-day preparation of the case for trial than Counsel. Counsel, however, was responsible for the guilt/innocence phase of the trial.

Co-Counsel testified he was primarily responsible for reviewing the work of the investigators, who interviewed witnesses and collected records. He could not recall the number of meetings he had with the investigators.

Co-Counsel recalled that one of the primary issues in the Petitioner's case was avoiding or limiting evidence of the murders in Oklahoma and Missouri. Co-Counsel acknowledged that the defense could have filed a motion in limine regarding the issue, which would have enabled them to ascertain what evidence from those cases that the State could introduce. While the Petitioner's statement to the police was redacted for trial to exclude references to the Oklahoma and Missouri murders, the Petitioner's assertions that he was eluding authorities in other states were not redacted. Further, the State introduced evidence that the Petitioner attempted to use a stolen credit card as part of its theory of the case.

Co-Counsel stated Counsel retained the services of psychologists, including Dr. Wilson, a clinical psychologist from Jackson, Tennessee. After reviewing Dr. Wilson's curriculum vitae, Co-Counsel acknowledged Dr. Wilson did not appear to be board-certified and that his primary area of practice appeared to include general psychology and alcohol and drug treatment. Co-Counsel further acknowledged that Dr. Wilson did not appear to have training or experience as a neuropsychologist.

Co-Counsel testified the Petitioner's records gathered by the investigators reported

17

that Petitioner had been involved in numerous accidents. He acknowledged that following one accident, Petitioner was "life-flighted" to the hospital. Co-Counsel explained that they were focused more on the Petitioner's chemical imbalance and bipolar disorder than any actual physical damage to his brain. Co-Counsel was aware the tests performed by Dr. Wilson might not detect brain damage but stated the doctor was not looking for brain damage at the time. Co-Counsel acknowledged being aware that brain damage and mental illness can create a cumulative effect on a person's brain. He said, however, the defense did not investigate this issue.

Co-Counsel recalled that developing a theory of defense was challenging and that the defense settled on presenting a theory of self-defense based upon evidence that the victim carried a .25 caliber pistol with him and that "there was some confusing evidence about whether or not that pistol had been pulled out and revealed to the [D]efendant prior to the crime actually occurring." Co-Counsel acknowledged that the Petitioner had told police officers that he stabbed the victim before the victim pulled out a gun. He further acknowledged the self-defense theory was weak, was only a defense to premeditated murder, and was likely not a defense to felony murder. Co-Counsel stated that self-defense was the only defense that they could present in light of Dr. Caruso's report, which did not support an insanity defense or defense based upon the Petitioner's diminished capacity. Co-Counsel said he did not believe the Petitioner would receive a verdict of not guilty and that he viewed the case as a sentencing case from the beginning. He explained that the most important aspect in obtaining a verdict of less than death is humanizing the defendant.

Before trial, the defense filed a motion for a change of venue. The trial court granted the motion and moved the trial from Dyer County to Lake County, the only other county in that judicial district. Co-Counsel said he was not pleased that the case was transferred to Lake County and attempted to have the trial transferred to Madison County. Counsel and Co-Counsel had the investigators conduct an in-depth investigation of Lake County jurors and the media exposure in Lake County. Co-Counsel stated that although they filed what he believed to be a "reasonably strong" motion for change of venue from Lake County, the trial court denied the motion.

Co-Counsel testified that, during voir dire, the defense team's goal was to select at least one juror who would "hang" the jury. Before trial, Counsel and Co-Counsel retained a juror selection specialist and prepared a questionnaire that was submitted to the jury pool. The specialist assisted Counsel and Co-Counsel in assessing the jurors during voir dire and during the selection process.

Co-Counsel recalled, that during voir dire, Counsel exercised only four peremptory strikes, and Co-Counsel acknowledged that all strikes must be exercised in order for the

appellate court to address any issues raised with the jury. The defense had questionnaires on every juror and conducted individual voir dire on every juror. Co-Counsel explained they did not strike additional jurors because "[o]ne, every action that we took with regard to the jurors, we did it while consulting with our specialist who had analyzed all of the questionnaires for us. And two, the option at the time, the general opinion shared by both Counsel and myself, along with the specialist, was that what was left in the pool was probably worse than what we had." Co-Counsel testified the defense team left jurors on the jury who they had originally moved to strike for cause, even though the trial court had denied the motion to strike. Co-Counsel explained, "we were attempting to improve our jury by striking them for cause, if, if we didn't–if we weren't successful, in those cases, we weren't, then we felt like a peremptory challenge or a peremptory strike would have maybe subjected us to getting someone worse up there." Co-Counsel testified that, at the time of trial, he believed the Petitioner had a chance of receiving a sentence of less than death in Lake County. In hindsight, he agreed the odds were against them, but he believed at the time of trial that they had chosen a jury who would not impose the death penalty.

Co-Counsel testified that, during the penalty phase, the defense team relied upon evidence of diminished capacity and attempted to build a sympathetic profile of the Petitioner in order to humanize him before the jury. Approximately one week prior to trial, Co-Counsel filed a notice that the defense intended to introduce evidence relating to the Petitioner's mental condition as mitigating evidence during the penalty phase.

Co-Counsel said that he assumed the role as the mitigation specialist, even though he also utilized Ms. Shettles as a mitigation investigator. Co-Counsel defined a mitigation specialist as one who "is trained in assisting to develop themes, strategies, as well as investigation of mitigation and the manner in which you approach mitigation." Co-Counsel stated that he reviewed all the materials and reports provided by Ms. Shettles.

Co-Counsel testified that he expected the investigators to learn of Dr. Caruso's approach to his examination of the Petitioner, to relate his results to Co-Counsel, and to advise Dr. Caruso on his behalf as to what Co-Counsel would expect of him before Co-Counsel prepared Dr. Caruso for his testimony. Co-Counsel did not see working directly with Dr. Caruso as an attorney's responsibility until they were preparing Dr. Caruso to testify. Co-Counsel was unaware of whether Counsel had any further contact with Dr. Caruso after retaining him. Co-Counsel did not recall meeting with Dr. Caruso until just before trial. He stated he may have had one or more telephone conferences with Dr. Caruso, but he was unsure whether Ms. Shettles was a party to the conferences or the substance of the conversations.

Co-Counsel was aware of the Petitioner's prior record, which included convictions

19

for passing bad checks in Florida. He acknowledged that, if the records showed that the offenses occurred in a six-week period of time, it would be significant in terms of examining the seriousness of the Petitioner's bipolar illness. Co-Counsel was also aware that the Petitioner had stolen vehicles and motorcycles and had traveled back and forth between Florida and Ohio. He was unsure whether he made a connection between the incidents and the seriousness of the Petitioner's bipolar disorder.

Co-Counsel said he received a letter from Ms. Shettles dated December 27, 2001, which stated that the Petitioner did not want his mother to attend trial. Co-Counsel did not specifically instruct Ms. Shettles to inform the Petitioner's mother that she was needed at trial regardless of the Petitioner's wishes. Co-Counsel conceded that in humanizing a defendant, "[f]ewer things are as effective as a mama sitting up there crying for her baby." The letter from Ms. Shettles further informed Co-Counsel that one of Petitioner's sisters was not able to attend due to emotional issues. Co-Counsel stated that, in retrospect, the information in the letter indicated that there may be problems with the family.

Co-Counsel said he also received memoranda from Ms. Shettles regarding her interviews with Kim Bowen. He did not specifically recall any conversations with Ms. Shettles about attempting to obtain additional information from Ms. Bowen to demonstrate the severity of Petitioner's bipolar disorder. Ms. Shettles also provided Co-Counsel with memoranda of her interviews with Crystal and Warren St. Clair, Roxanne Thacker, Sherri Thacker Grinnan, Ken Copley, Helen Richey, David Thacker, Nikki Thacker, and the Petitioner's mother and stepfather.

Co-Counsel noted Ms. Shettles was unable to interview the Petitioner's biological father, but Co-Counsel had information from the Petitioner that the Petitioner's father would not necessarily be a helpful witness. Co-Counsel testified it is sometimes difficult to persuade a defendant's family to cooperate due to public embarrassment and difficulty with a family member "coming to grips" with the facts of the offense. Others reasons for the lack of cooperation can include dysfunction in the family and problems suffered by that particular family member. Co-Counsel noted a trained mitigation specialist could have possibly been successful in interviewing the Petitioner's father. Co-Counsel, however, was not going to call Petitioner's father as a witness because he was uncertain how the Petitioner's father would testify.

Co-Counsel testified that, during the penalty phase, he presented witnesses who were cooperative, had good things to say about the Petitioner, and could explain his bipolar disorder. He offered Ms. Bowen's testimony that she maintained regular contact with the Petitioner and visited him, along with Ms. St. Clair, who had contact with the Petitioner, on multiple occasions. Both these witnesses, Co-Counsel believed, would help humanize the

Petitioner. Co-Counsel did not recall ever being contacted by the Petitioner's father, stepfather, or sisters. Co-Counsel noted, however, that Ms. Shettles's memorandum from her interview with Sherri Thacker Frinnan, the Petitioner's sister, stated that Frinnan was willing to provide information for the defense but was not particularly sympathetic or supportive of the Petitioner. This memorandum led Co-Counsel to the conclusion that Frinnan would not be a good witness. Co-Counsel further testified that the Petitioner's younger sister did not want to testify on the Petitioner's behalf.

Co-Counsel said one of the issues that arose with regard to mitigation evidence was demonstrating the seriousness of the Petitioner's bipolar illness without discussing the murders in Oklahoma and Missouri. Co-Counsel felt that his presentation of the evidence was "like walking on eggshells." Co-Counsel stated he made a strategic decision to exercise caution so that he would not open the door to allow the State to present evidence of the two prior murders for which the Petitioner had not yet been charged at the time of trial.

Co-Counsel testified that, before trial, the defense team filed a motion in limine asking that the State be prohibited from arguing to the jury the costs of incarcerating someone for life. Co-Counsel explained he did not want the State to argue to the jury that it was less expensive to execute someone than to incarcerate the person for the rest of his or her life. Co-Counsel said he called Ms. Shettles as a witness during the penalty phase to testify about the cost of incarcerating someone for life as opposed to executing them. Co-Counsel further stated that their plan "backfired" as the State was prepared for the question, and Ms. Shettles was not really qualified to offer the testimony. Co-Counsel recalled Counsel may have discussed the issue with Ms. Shettles before her testimony but that "we probably didn't put a lot of preparation time into it."

Ms. Shettles testified that she had been an investigator with Inquisitor, Inc. since 1993. She had a bachelor's degree in sociology and social work and a master's degree in counseling. Before being employed by Inquisitor, Ms. Shettles was employed at the Tennessee Board of Parole from 1977 to 1990. She also worked as an investigator for the Shelby County District Attorney General's office for one year and supervised the community corrections program for one year. Inquisitor hired Ms. Shettles to work in the area of mitigation.

Ms. Shettles testified she was assigned to the Petitioner's case. She was assisted by Julie Hackenmiller, also a mitigation specialist, who conducted some of the interviews, and LeAnn Hudgins, a guilt/innocence investigator, who collected some of the records. Ms. Shettles conducted preliminary interviews with potential witnesses and family members, including Ms. Bowen. Ms. Shettles met with the Petitioner's mother and stepfather, Sherri Thacker Frinnan, Crystal St. Clair and her husband, Roxanne Evans, and possibly another

21

relative. Ms. Hackenmiller interviewed the Petitioner's sister, Nikki, who lived in New Jersey. Ms. Shettles stated that she was unable to contact the Petitioner's father. Ms. Shettles testified she learned from other family members that the Petitioner's father did not want to see or meet with her.

Ms. Shettles stated that, as part of her investigation, she traveled to Ohio and West Virginia in May 2001 to meet members of the Petitioner's family, his friends, his former employers, and others who knew the Petitioner and could provide helpful information. Ms. Hackenmiller interviewed family members in Florida. Ms. Shettles also reviewed the memoranda prepared by the guilt/innocence team from their investigation in Oklahoma to determine whether any of the information related to mitigation. Ms. Shettles testified she interviewed most of the witnesses in-person on one occasion, and she thought one interview could be sufficient to obtain the information needed depending upon the person interviewed and the sensitive nature of the information. She believed, however, that a follow-up interview is best if given the opportunity.

Ms. Shettles testified Petitioner's mother, Lillian Johnston, was cooperative but was forthcoming about information that reflected poorly on her, her background, or the way that she treated her children. Ms. Shettles noted that she had received information that, while the Petitioner lived in Spain with his mother and his biological father, Ms. Johnston may have had multiple affairs with other men. There were also allegations that she did not care for her children as a result and was ultimately asked to leave Spain. Ms. Johnston, however, did not confirm these allegations.

Ms. Shettles stated that, during their discussions, Ms. Johnston refused to attend the trial. Ms. Johnston informed Ms. Shettles that the Petitioner had requested she not attend the trial, and she intended to honor that request. Ms. Shettles recalled speaking to the defense team about the importance of Ms. Johnston's attendance at trial. She did not recall, however, discussing with them ways to change Ms. Johnston's mind. Ms. Shettles stated both of the Petitioner's sisters also refused to attend the trial.

Ms. Shettles testified that they chose to present evidence surrounding the Petitioner's bipolar disorder when asking the jury to impose a sentence of life in prison rather than a sentence of death. The theme of the mitigation evidence presented became apparent early on in Ms. Shettles investigation from her interviews, the Petitioner's records, and other information. Ms. Shettles did not recall having much interaction with Counsel, but she communicated primarily with Co-Counsel through telephone calls and correspondence. Ms. Shettles conceded that she did not recall receiving direction from the defense team about what evidence she should follow up on and what evidence she should research. She also did not recall many strategic meetings with Counsel or Co-Counsel to develop a mitigation

theme.

Ms. Shettles stated she developed a document of factors and themes that could support mitigation of the Petitioner's sentence, which she sent to Counsel and Co-Counsel. She included themes she believed had been discovered through various interviews and records. She believed these themes could have been presented to give the jury a better understanding of the Petitioner's actions when it considered his sentence. Ms. Shettles stated that, although she shared the document with Counsel, she could not recall discussing how the themes could be presented. She acknowledged a few of the themes were presented at trial, including Petitioner's bipolar disorder, his childhood, and his good working skills.

Ms. Shettles also prepared a mitigation time line for the team to use as a resource for the Petitioner's background. She explained the documents aided in identifying various periods of either manic or hypomanic behavior. Specifically, she noted the Petitioner ran away as a young teenager. She further noted the Petitioner wrote many bad checks in Florida in a brief period of time.

Ms. Shettles testified that she also prepared a summary of the Petitioner's social history and an exhibit referred to as a "Bridge Exhibit," which was a visual way to summarize some of the more significant events in the Petitioner's life in order to explain and give context to how the Petitioner got to his current circumstances. Ms. Shettles thought an expert testifying on the Petitioner's behalf could use the exhibit at trial to illustrate points within the Petitioner's social history. Ms. Shettles believed Counsel could have also used the exhibit during closing argument. She recalled, however, that the exhibit was not used during the Petitioner's trial.

Ms. Shettles acknowledged a memorandum of an interview with Trena Thacker, Petitioner's then wife, which included helpful mitigation information. The memorandum referred to the Petitioner exhibiting symptoms of bipolar disorder, including shopping sprees, issues with money, depression, and "back and forth behaviors." Ms. Shettles stated Ms. Hudgins interviewed Margie Fry, the Petitioner's landlord. The memorandum of the interview provided that Ms. Fry stated the Petitioner was helpful to her and attentive to Trena Thacker's child and that Ms. Fry believed the murders were out of character. Ms. Shettles was aware of correspondence from the Petitioner to his younger sister, Nikki, in which he complained of being unable to sleep and of having nightmares. Ms. Shettles acknowledged that the letter would have supported other evidence showing the Petitioner suffered from bipolar disorder and also exhibited signs of remorse.

Ms. Shettles said Counsel called her as a witness at trial to discuss the difference in the cost of incarceration of an inmate for life or life without parole versus the cost of

23

incarceration of an inmate on death row. Ms. Shettles further said Counsel advised her that she would be presenting the testimony approximately ten minutes before she was called to the stand. Ms. Shettles did not believe she had the expertise to offer the testimony or that it had any relevance or significance with the jury.

Kim Bowen testified she met the Petitioner while they were both working at Red Lobster in Huntington, West Virginia, in 1993. They dated and lived together from 1993 to 1997. Ms. Bowen stated that before the Petitioner's trial, Ms. Shettles came to her house "a couple of times." She also spoke to Co-Counsel on several occasions, and Co-Counsel questioned her about the Petitioner. Ms. Bowen maintained she never spoke to Dr. Caruso before trial. She stated she visited the Petitioner on two occasions before trial, but she was unaware whether any other family members visited the Petitioner.

Ms. Bowen maintained she did not learn that she would testify at trial until Co-Counsel mentioned it to her in the hallway during the trial. Although Co-Counsel told her that she would testify the following day, she actually testified two hours later that same afternoon. Ms. Bowen stated she did not feel that Counsel or Co-Counsel prepared her to testify. Ms. Bowen further stated she was "horribly nervous" and would have been less nervous if she had been prepared.

Ms. Bowen testified that she generally understood bipolar disorder and felt she inadequately verbalized the Petitioner's symptoms when she testified. She further stated that, if she had been asked at trial, she would have told the jury about positive things the Petitioner had done such as planning candlelight dinners, leaving notes for her when he was out of town, constructing a dog house, taking her for a vacation in Cincinnati, purchasing a kitten for her daughter for Christmas, and purchasing Execedrin in the middle of the night in case she awoke with a headache. She would have asked the jury to spare the Petitioner's life because the Petitioner has the "absolute ability to enhance other people's lives" when in a controlled environment.

Ray Thacker, Petitioner's biological father, testified he was in the United States Air Force while married to the Lillian Johnston, the Petitioner's mother. Shortly after they were married, he went to basic training in Amarillo, Texas, for approximately six weeks and, when he returned, he heard rumors that Ms. Johnston had been unfaithful. Mr. Thacker was next stationed in Tampa, Florida, where the Petitioner was born, and he was subsequently stationed at Zurich Air Base in Spain. While in Spain, Mr. Thacker caught Ms. Johnston with another man, and she asked him for permission to continue dating the man while the two were still married. Her infidelity began to interfere with Mr. Thacker's work, so the base commander ordered Mr. Thacker to take his wife and children back to the United States. After returning his family to the United States, Mr. Thacker returned to Spain.

24

Mr. Thacker stated that Ms. Johnston continued to have problems after returning to the United States. His oldest daughter, who was four or five years old at the time, was having nightmares and was, he thought, close to having a nervous breakdown. Ms. Johnston was unable to care for her, and Mr. Thacker stated that he heard allegations that Ms. Johnston was abusing the children. Upon returning to Spain, Mr. Thacker was contacted by the Red Cross and told that he needed to return to the United States due to Ms. Johnston's problems with the children and herself. Mr. Thacker requested a transfer to the United States, and when the military denied the request, Mr. Thacker ceased his military service.

Mr. Thacker admitted his children had an unstable childhood. After divorcing the Petitioner's mother, Mr. Thacker remarried, and his children lived with him on different occasions. Mr. Thacker recalled that, on one occasion, his children lived with him for approximately one month when his second wife told him that if the children did not leave, then she would leave. As a result of this ultimatum, the children returned to live with their mother.

Mr. Thacker recalled that when the Petitioner was a child he was difficult to handle, in part because he had difficulty being still. Mr. Thacker further recalled occasions when the Petitioner was unable to sleep and appeared nervous. The Petitioner also had problems focusing his attention on one task for extended durations of time. Mr. Thacker stated that, on one occasion at a pizza parlor when the Petitioner was an adult, the Petitioner arose from his chair and stated, "I've had enough of this. I'm not going to take it any more." The Petitioner exited the restaurant, and Mr. Thacker followed him. When Mr. Thacker questioned him about the incident, the Petitioner denied making the statement and maintained that he went outside to smoke a cigarette.

Mr. Thacker maintained he would have been willing to testify at the Petitioner's trial but was neither asked to do so nor notified of the trial date. Mr. Thacker said he would have testified at trial that he loved the Petitioner and that the Petitioner never would have committed the offenses if he had been "in his right mind." Mr. Thacker recalled the FBI came to his residence in late 1999 and informed him that the Petitioner was wanted for murder. Mr. Thacker admitted he heard from the Petitioner's sister that he had been captured in Dyersburg, Tennessee. He, however, never attempted to see the Petitioner, explaining that a relative had informed him that he would not be able to visit the Petitioner. He further maintained he was unaware that the Petitioner's stepmother sent the Petitioner a letter stating she and Mr. Thacker could not assist him.

Mr. Thacker testified that, in December 1999 and January 2000, he was living in New Carlisle, Ohio. He believed the Petitioner was living in Florida at that time. Mr. Thacker was unaware the Petitioner had gotten married and lived in Oklahoma during that time

period. Mr. Thacker stated it would not surprise him if the Petitioner told an investigator that he and the Petitioner had a bad relationship.

Lillian Johnston, the Petitioner's mother, testified that, when she was young, her parents' idea of discipline was "very rough" and that she received such discipline every time her father became upset or intoxicated. Ms. Johnston recalled her father also displayed aggressive sexual behavior toward her and her sisters. Two of her brothers had also been accused of similar behavior. Ms. Johnston testified that her father was easily agitated, had mood swings, and abused her mother.

Ms. Johnston said she was nineteen years old when she married Mr. Thacker. Their first child was born a year and a half into the marriage, and the Petitioner was born a year and a half later. Ms. Johnston recalled that when the Petitioner was first born, he was allergic to milk and was often sick. She stated the Petitioner would remove his diaper and spread feces on the walls.

Ms. Johnston testified the family lived in poor conditions while residing in Spain. They lived in a motel for three months and then an apartment that was scarcely furnished. The family was forced to go without food, diapers, and milk. During this time, the Petitioner fell from his crib, resulting in a knot on his head. Ms. Johnson said that also during this time she met "Jose," a man who took she and the children to restaurants. She said that, because of her "friendship" with "Jose," she and the children were forced to leave Spain. At the time, the Petitioner was almost two years old. Ms. Johnston recalled that shortly after returning to the United States, the Petitioner fell out of a moving vehicle, hit his head, and lost consciousness.

Ms. Johnston testified that, after she and Mr. Thacker divorced, Mr. Thacker did not provide child support, so Ms. Johnston had to work and be away from the children. A babysitter cared for the children until Ms. Johnston's oldest daughter turned eleven years old and assumed responsibility for the children. Ms. Johnston admitted she was consuming alcohol often during this time period. She recalled that, when the Petitioner was four or five years old, he developed a high fever, but they never discovered the cause. The fevers continued to occur twice each year until the Petitioner was twelve years old.

Ms. Johnston recalled an occasion during which the children moved to live with Mr. Thacker for a short time. Mr. Thacker's wife told him that either the children needed to leave or she would leave. The children's clothes were put in trash bags, and the children were set out beside the road until their grandmother picked them up and called Ms. Johnston. Ms. Johnston testified the incident seemed to have an effect on the children.

26

Ms. Johnston stated she, the Petitioner, and her youngest child moved to Florida when the Petitioner was thirteen years old. A few months later, she met the man to whom she was married at the time of the post-conviction hearing. Ms. Johnston said that when the Petitioner was fifteen years old, he began working at Morrison's Cafeteria in Boynton Beach, Florida. She recalled that, up until this employment, the Petitioner appeared very angry and moody but that he seemed happy while working at the cafeteria. The Petitioner was fired from the job after "Sherri," the Petitioner's sister, moved to Florida, began working at the cafeteria, and told the manager that the Petitioner was fifteen years old.

Ms. Johnston testified that her daughter, Sherri, had threatened to commit suicide and was in a mental facility for six to seven weeks. Sherri had been married four times and had been diagnosed as suffering from bipolar disorder.

Ms. Johnston testified she believed that the Petitioner's behavior as a child was related to bipolar disorder. She was unable to control the Petitioner and spanked him often. The Petitioner's behavior only worsened. Ms. Johnston stated that, after the Petitioner was diagnosed with bipolar disorder and began taking lithium, he became kinder and was never angry.

Ms. Johnston testified the Petitioner later moved to Oklahoma where her husband had offered him a job. The Petitioner became upset because he could not live with Ms. Johnston and her husband. The Petitioner met Trena Thacker two to three weeks later, and they were married shortly thereafter. Trena quit her job shortly after they married and the Petitioner eventually lost his job. Ms. Johnston recalled that the Petitioner did not handle the loss of his job well and fell behind with his bills. Ms. Johnston's husband offered the Petitioner another job in Chicago, but the Petitioner did not accept the position due to the location.

Ms. Johnston testified she was never contacted by the Petitioner's trial counsel. She stated that, although Ms. Shettles contacted her, she did not recall Ms. Shettles requesting she testify at the Petitioner's trial. Ms. Johnston admitted the Petitioner requested she not attend trial but maintained she would have testified had trial counsel informed her that her testimony would be helpful. Ms. Johnston said that, if she had testified at trial, she would have asked the jury to spare the Petitioner's life and told them that the Petitioner had a big heart and a family who loved him.

Susan Wardell, testified as an expert in the area of mitigation development and presentation in capital cases. Ms. Wardell explained the duties and responsibilities of a mitigation specialist, saying they must learn as much as possible about a defendant's life and social history. She stated a degree in social work is critical as a mitigation specialist because social work involves training on family, work, school, and community systems. Social work

also involves learning about mental illness, developmental disabilities, and personality disorders. A mitigation specialist must be "detail oriented" and examine how factors in an individual's life affect how the individual developed as a person. Ms. Wardell acknowledged that there is no association that provides certification for a mitigation specialist.

Ms. Wardell testified that when she acts as a mitigation specialist on a case, her first task is to interview the client and order records. Her aim is to become knowledgeable about the client's educational, medical, work, and military history. Ms. Wardell said she would ask the client, who knows him or her best, about these subjects and then she would interview close family members, and then family members, employers, girlfriends, childhood friends, and teachers.

Ms. Wardell noted that family members are generally inaccessible and reluctant to provide information. Family members can be confused and angry and sometimes feel as if they are being blamed for the client's actions, often finding it difficult to acknowledge their own shortcomings. Ms. Wardell stated she spends quite a bit of time with the client at the trial level to gain the client's trust. Once a client trusts Ms. Wardell, the client will tell family members to provide her with all the necessary information. Wardell testified she almost always finds that the story that she hears from the client and the client's family about what the family was like during the first interview is not accurate.

Ms. Wardell said, in her role as a mitigation specialist, she also attempted to document as many of the details of the client's social history as possible. She opined that a mitigation specialist must examine the dynamics between the parents and the client and also the parents and their parents. Ms. Wardell stated the time period should expand beyond the time in which the client was born "[b]ecause we're all a product of how we were parented and the environment we were raised in." She said she kept the attorneys abreast of her progress and attempted to develop a time line of events for them.

Ms. Wardell testified she also discussed with a client's attorneys the need for experts. She explained that, due to all the different specialities, a mental health expert need not be chosen until it is determined what issues the client has experienced. Ms. Wardell further explained a client like the Petitioner, who has suffered many head injuries, would need to be examined by a neuropsychologist.

Ms. Wardell testified she reviewed the time line prepared by Ms. Shettles and noted many mistakes. She noted the Petitioner's grandfather, and not his father, was left on someone's doorstep as a baby. Ms. Wardell further noted chronological errors and omissions. The time line also omitted the timing of the Petitioner's mother's affairs and timing of the Petitioner's parents' breakups. Ms. Wardell prepared a time line showing that

the Petitioner's impulsive behavior occurred in clusters. Her time line showed the Petitioner attended many different schools due to his parents' instability. Ms. Wardell's time line also illustrated the Petitioner's moods at different time of the year.

Ms. Wardell stated that, while not necessarily standard practice in 2002 when the Petitioner was sentenced, a mitigation specialist should prepare a written social history to aid the mental health expert examining the client and also aid the attorneys representing him. The written social history should include more detail than the time line and should explain where the family came from and how they were raised. Ms. Wardell testified she prepared a "genogram," or a written social history, for the Petitioner. Ms. Wardell explained her genogram showed the number of people in the Petitioner's family who behaved in a manner that could have indicated that they suffered from bipolar disorder. The genogram illustrated the number of relatives who were alcoholics and abusive. Ms. Wardell opined mental illness existed on both sides of the Petitioner's family. She noted the Petitioner's niece was diagnosed with bipolar disorder when she was fourteen or fifteen years old. Ms. Wardell further noted that the Petitioner's social history indicated he exhibited symptoms of bipolar disorder in his teens. Ms. Wardell said there seemed to be a lack of understanding on the part of Counsel and Co-Counsel regarding the information obtained. She said that this was not uncommon because attorneys are seldom educated in mental health issues and must take it upon themselves to become educated on the subject.

Ms. Wardell testified the "Steve's Bridge" exhibit prepared by Ms. Shettles was an excellent way to demonstrate that an accumulation of factors, and not just one factor, can cause a person to break. Ms. Wardell said Ms. Shettles "did a lot of very good work," and she expressed surprise that Counsel and Co-Counsel had used so little of the work that Ms. Shettles had done in their representation of the Petitioner.

Dr. Jonathan Pincus testified he is the chief of neurology at the Veterans Administration Medical Center in Washington, D.C. and also a professor of neurology at Georgetown University. The post-conviction court admitted him as an expert in neurology. Dr. Pincus explained that psychiatry and neurology address brain diseases and that the fields often intersect. Psychiatry generally addressed diseases of the mind, behavior, and thought, while neurology addressed diseases of motor function, sensory function, speech, and memory.

Dr. Pincus evaluated the Petitioner in June 2008 at the River Bend maximum security institute. He also reviewed the Petitioner's history and interviewed the Petitioner's mother, father, stepfather, girlfriend, and an acquaintance. Dr. Pincus opined that the Petitioner suffered from bipolar disorder, as he exhibited many symptoms of bipolar disorder, including psychomotor hyperactivity, which meant the Petitioner was physically unable to sit still

"when he was in the grip of this [mania]." Both the Petitioner's mother and his girlfriend described his behavior to Dr. Pincus as physically agitated during these episodes. Dr. Pincus said the Petitioner would also spend money unwisely, which led to his girlfriend assuming responsibility for paying the household bills.

Dr. Pincus testified that his evaluation indicated that, when the Petitioner would become manic, he was unable to sleep, sleeping for only one or two hours every night. After a period of a few days, he would then sleep for an unusual amount of time. Dr. Pincus explained that, during these episodes, the Petitioner had poor concentration, was unable to analyze things clearly, and was irritable. Dr. Pincus stated the Petitioner was also hypersexual and was indiscriminate in the number of women he was with even while he was in a relationship.

Dr. Pincus testified that one of the symptoms characteristically associated with bipolar disorder was alteration between depression with mania. Dr. Pincus explained periods of mania can last for days, weeks, or months, most commonly lasting for weeks or months. In the Petitioner's case, however, there were manic episodes that lasted for years and depression episodes that lasted a few weeks longer. Dr. Pincus stated that his investigation of the Petitioner revealed that, during depression episodes, the Petitioner thought only about his failure as a man and human being, and he exhibited no energy, sleeping sixteen to eighteen hours per day.

Dr. Pincus testified it was "highly likely" the Petitioner was "manic depressive." Dr. Pincus admitted there is no test to diagnose bipolar disorder and that "you're pretty much stuck with the history." He explained "[i]t's a purely clinical diagnosis and every diagnosis carries some slight degree of uncertainty with it and that's why I said 'highly likely.'"

Dr. Pincus stated the manic episodes of bipolar are treated, as a standard practice, by proscribing lithium. Lithium, he said, has multiple side effects that are difficult for people to handle. For someone who is bipolar perhaps the most difficult side effect is that the lithium ceases the manic episode. For someone in a manic episode, this is difficult because they "don't want to be normal" and generally "like the excitement of the mania." In the Petitioner's case, however, his girlfriend successfully persuaded him to seek treatment from a clinic where he was diagnosed as bipolar and prescribed lithium. The Petitioner took the medication for some time period, and his behavior changed as a result, but he hated the effect of the medication. The Petitioner, therefore, chose to discontinue taking the lithium. Dr. Pincus said "[i]f he were on lithium, I suspect he would not have committed that murder–any of them."

Dr. Pincus testified bipolar disorder is a genetic disease and approximately one-half

of those who suffer from bipolar disorder have a family history of the disease. Dr. Pincus noted the Petitioner's mother had a period of hypersexuality in Spain while his father was in the military, which resulted in her and her children being sent back to the United States. Dr. Pincus opined that the Petitioner's mother's hypersexuality was attributable to mental disease. Although the Petitioner told Dr. Pincus his father was the parent who was unable to handle money and was hypersexual, Dr. Pincus believed that both parents had abnormalities, with the Petitioner's mother being most severely affected. Dr. Pincus said the Petitioner's older sister also exhibited many symptoms of bipolar disorder, and her child had been diagnosed with bipolar disorder. The Petitioner's history also showed that his maternal grandfather was an alcoholic, was sexually and physically abusive to his daughters, and exhibited mood swings. Dr. Pincus found that this family history supported the Petitioner's diagnosis of bipolar disorder.

Dr. Pincus testified that a child suffering with bipolar disorder is often hyperactive, does not sleep, and does not pay attention. The child is often very difficult to control and misbehaves in a high-spirited way. Dr. Pincus said that, if the parent of a child with bipolar disorder is having an episode of mania or depression themselves, the parent's ability to control himself or herself and to control his or her anger is lessened, which often results in the child being physically punished. Dr. Pincus noted the Petitioner's mother admitted using force and beating the Petitioner but stated that the beating did not deter the Petitioner's behavior. On two or three occasions, the Petitioner's mother became so frustrated that she left the Petitioner and his sister at their father's house. The Petitioner and his stepmother, with whom his father lived at the time, did not get along. When the Petitioner was six years old, his stepmother put all of the Petitioner's possessions along with his sister's possessions into garbage bags, took them to the curb, and said, "You're out of this house. You're garbage. I don't want you here and you'll be here until you get picked up." The children remained outside until their grandmother retrieved them that night.

Dr. Pincus performed a neurologic examination of the Petitioner and also administered multiple tests. In one test, referred to as "spooning of fingers with choreiform," Dr. Pincus asked the Petitioner to hold his hands out in front of him. When the Petitioner did so, his fingers over extended making his hand look like a spoon. Dr. Pincus said this, in combination with the involuntary movements he noticed in the Petitioner's hands, led him to the conclusion that there was something wrong with the part of the brain called the basal ganglia. Dr. Pincus explained "[i]t's a suble finding, but it's a real one and suggests that there was something wrong with these gray matter entities that are deep within the brain in the frontal lobe."

In another test, Dr. Pincus instructed the Petitioner to close his eyes, and Dr. Pincus touched his left arm. Dr. Pincus asked the Petitioner where he had touched him, and

31

Petitioner identified his left arm.  Dr. Pincus repeated the test with the Petitioner's right arm, and the Petitioner identified his right arm.  When Dr. Pincus touched both arms, however, the Petitioner stated the doctor was only touching his left arm.  The Petitioner did not feel the doctor touching his right arm when the doctor was touching both sides at the same time.  Dr. Pincus testified this indicated something is wrong with the left parietal lobe of Petitioner's brain, which controls the right side of the body.

Dr. Pincus testified that, in his report, he stated that his tests indicated that the Petitioner had "generalized reflex hyperactivity with bilateral crossed adductors and a right Babinski."  Dr. Pincus explained he used a reflex hammer to tap the Petitioner's ankles, knees, and other reflexes.  Dr. Pincus said the Petitioner had an excessive response which indicated bilateral damage to the motor pathways area of the nervous system.  Dr. Pincus tapped the inside of the Petitioner's right knee, and the Petitioner's left leg moved to the midline, which is called a crossed adductor.  When Dr. Pincus tapped the inside of Petitioner's left knee, his right knee moved to the midline.  Dr. Pincus stated the bilateral crossed adductor reflexes indicate a pathological degree of hyperactivity of the reflexes.  Dr. Pincus also checked the Petitioner's Babinski reflex, which involved stroking the bottom of the Petitioner's feet.  Dr. Pincus explained the reflex is normal if the toes flex downward but is abnormal if the big toe extends.  Dr. Pincus testified that the Petitioner had a clear right Babinski reflex, which indicated that there was something wrong with the left side of the Petitioner's brain.  Dr. Pincus explained:

> And it's quite consistent with the sensory findings and it truly means that in the frontal parietal region of the left side of his brain, there are neurons that are not working properly.  But there is also disease on both sides of the brain, because the reflexes on both sides of the body are pathologically increased.

Dr. Pincus also performed a test where he asked the Petitioner to relax and pretend to be a rag doll, slouching in the chair in which he sat.  The doctor instructed the Petitioner to extend a leg out and support the entire weight of the leg on his heels.  Dr. Pincus put his hand under the Petitioner's thigh and gently pulled upward.  Dr. Pincus explained that the Petitioner's performance on the test indicated that his frontal lobe was not working properly.

Dr. Pincus also conducted a face/hand test where he touched the left side or right side of the Petitioner's cheek and hand at the same time while the Petitioner's eyes were closed.  The doctor said the Petitioner reported only feeling the doctor touch his face and not his hand.  Dr. Pincus explained "[t]hat means that he is extinguishing the less significant of the two.  The ability to pay attention to the less-important sensory stimulus is the frontal lobe.  The frontal lobe allows you to pay attention to that.  There was a problem with his sensory attentiveness."

Dr. Pincus testified that the Petitioner's results on some of the frontal tests were normal, while others were abnormal. He said, however, a finding of a frontal lobe abnormality could be supported by an abnormal test result on only three tests. Dr. Pincus explained one of the primary functions of the frontal lobe is to provide mature analysis and judgment. The frontal lobe tends to dampen and control impulses and urges. A person who has a frontal lobe that is not functioning properly often does whatever he or she wishes. Dr. Pincus opined that while the Petitioner had difficulty controlling his impulse to kill, the doctor did not believe that "he was completely without responsibility of that."

Dr. Pincus opined that the Petitioner had a neurological deficit and bipolar disorder and that, as a result, he did not have the capacity to plan and make proper decisions. The doctor stated that the Petitioner's judgment "was not eliminated by the disease but that his scope of free will was limited by it." Dr. Pincus further opined that the Petitioner's capacity to plan was diminished but not completely eliminated by his illness. He explained that when a person has brain damage, the amount of stress necessary to throw that person over the edge into chaos was not great and that the ability to make immediate decisions was altered. Dr. Pincus did not believe the Petitioner was capable of cool reflection.

Dr. Pincus testified the initial homicide occurred as a result of the Petitioner's plan to obtain money so that he could purchase Christmas presents for his children. The Petitioner then planned to flee to East Tennessee where he would live in the woods. Dr. Pincus conceded the Petitioner's continued escape involved planning and decision-making. Dr. Pincus further acknowledged that if the Petitioner's explanation to police regarding his reasons for killing the victim was correct, it would indicate some planning on the Petitioner's part. Dr. Pincus also admitted the Petitioner's actions after killing the victim required process and planning. The doctor opined, however, that such planning was not indicative of a normal person's actions but was a sign of the Petitioner's disturbance. Dr. Pincus stated that the Petitioner's "plan . . . to avoid apprehension and to avoid punishment was primitive, the kind of thing a child might do."

Dr. Pincus testified that he was aware that, during the course of his crime spree, the Petitioner had taken a vehicle occupied by a mother, grandmother, and a child and chosen not to harm any of them. The doctor stated that the Petitioner made the wrong decision in stealing the vehicle but made the right decision in not killing the occupants. Dr. Pincus admitted that the Petitioner did have some control and could make correct choices. Dr. Pincus testified that the fact that the Petitioner did not kill other people does not invalidate his diagnosis or his opinion that mental illness and brain damage played a role in limiting the Petitioner's exercise of free will. The doctor further testified that the Petitioner was in a manic state for the entire ten-day period in which the crime spree occurred and the proper decisions made by the Petitioner during the manic state were due to "[v]arations in the

33

intensity of the abnormality that was induced by the manic state."

Dr. Keith Caruso is board certified in both general psychiatry and forensic psychiatry. The post-conviction court permitted him to testify as an expert in psychiatry. Dr. Caruso evaluated the Petitioner in July 2001, wrote a report of the evaluation, and testified at the Petitioner's trial regarding his findings.

Dr. Caruso was unable to recall speaking with Counsel after their original conversation about getting him appointed to the case. He said that, if he did talk to Counsel, the conversation was brief. Dr. Caruso stated he called Counsel and Co-Counsel repeatedly and essentially received no response until Co-Counsel arranged a meeting with him the night before he was to testify. Due to an accident on the interstate that evening, Dr. Caruso was delayed and unable to attend the meeting. Dr. Caruso stated that, when working with attorneys on a capital case, he generally had multiple contacts with them, and he had never worked on any other case where there was so little preparation and dialogue.

Dr. Caruso testified that he may have met with trial counsel for two or three minutes before his testimony during the penalty phase. At the time of his testimony, he did not know what questions trial counsel intended to ask him during his testimony. Before testifying, Dr. Caruso learned that the trial court was fearful that he may discuss matters that had been ruled inadmissible, but Dr. Caruso maintained he did not intend to discuss those issues. Dr. Caruso acknowledged that his report included information that may have led the trial court to believe he would offer inadmissible testimony, but he stated he could have redacted the information from the report if trial counsel had so instructed. Dr. Caruso stated that, as a result, he believed his trial testimony was limited regarding the psychosocial factors in the Petitioner's childhood that intersected with his bipolar disorder, leading the Petitioner to react in a certain way at the time of the homicides.

Dr. Caruso testified that the trial court did not consult with him on alternate ways to testify regarding the information that he wanted to get into evidence. Dr. Caruso explained that part of a psychiatric evaluation is to examine the person's social and developmental history to aid in understanding the person's personality and facts that may be particularly stressful to the person. Dr. Caruso noted the Petitioner was often left alone while his mother, a single parent, was working two jobs. Before the murders, a bank official informed the Petitioner that his trailer was going to be taken away from him. Poverty once again became an issue, and the Petitioner's marriage was threatened. Dr. Caruso noted the Petitioner's most desperate actions occurred at times when he did not feel as if he had anywhere else to go.

Dr. Caruso explained bipolar disorder is an episodic illness and a person can cycle in

and out of depression and mania within the same episode. Episodes are generally precipitated by psychosocial stressors. Dr. Caruso stated:

> I could have explained that . . . the theme of loss, of return to poverty, of abandonment, all of these issues were the stressors that tipped [the Petitioner] off and put him into the manic episode and then some of the behavior that occurred, well, the exposure to abuse as a child teaches him violence as problem-solving and when he's in a–when he's in a particularly stressed state, it's one of the things that you fall back upon, so that there wasn't–there wasn't a lot of teaching of effective coping mechanisms throughout his childhood. Those are the kinds of things that I would have liked to have been able to have said.

Dr. Caruso said that he testified at trial that the Petitioner had bipolar disorder and that the disorder impaired his capacity to control his behavior. Dr. Caruso maintained he was cut off at trial when he attempted to testify about the Petitioner's childhood, but he acknowledged a full description of the Petitioner's childhood was introduced before the jury. Dr. Caruso stated he felt that he should have been allowed to provide thorough details and a full explanation of how the factors of his childhood intersected with recent events to subsequently affect his behavior.

Dr. Caruso testified he wrote a letter to trial counsel recommending neuropsychological testing due to the Petitioner's history of head trauma. Dr. Caruso said at age one or two, the Petitioner fell from an automobile and that he fell again at age eight or nine. At age fifteen, the Petitioner was involved in a motor vehicle accident where he lost consciousness due to bleeding. The Petitioner was also injured in a motorcycle accident and required several stitches to his chin. Dr. Caruso stated that the Petitioner had a significant history of head trauma. Dr. Caruso stated that, after interviewing the Petitioner and reviewing his statement to the police, he did not have a sense that the Petitioner had brain damage. The doctor explained that, due to the Petitioner's history of head trauma, he believed the Petitioner should have undergone neuropsychological testing. Dr. Caruso testified he also provided trial counsel with an affidavit regarding the need for neuropsychological testing.

Dr. Caruso acknowledged that in his letter to trial counsel enclosing the report he stated, "Although you received abundant accounts of suffering closed-head trauma, medical records did not substantiate this." Dr. Caruso said he made an error in the letter because he did review a medical record that suggested the Petitioner suffered head trauma after striking his chin in a motorcycle accident. The next sentence of the doctor's letter stated that the Petitioner's "description of the events in his statement to police and your interviews with him

do not suggest any structural brain impairment." Dr. Caruso explained that in speaking to the Petitioner, it was not readily apparent to him that the Petitioner had brain damage and stated "but it appears that I was wrong."

Dr. Caruso learned the Petitioner had brain damage or a deficit due to closed-head trauma from the reports of Dr. Pincus and Dr. Pamela Auble. Dr. Caruso explained testing would demonstrate whether someone has functional deficits, and a MRI or a CT scan would demonstrate structural damage. Psychological testing may show evidence of deficits that would not have been shown on an MRI. Dr. Caruso said Dr. Pincus's report provided that the MRI of the Petitioner did not indicate evidence of brain damage but that Dr. Pincus found abnormalities in his clinical and neurological examination of the Petitioner.

Dr. Caruso testified that, at the time he examined the Petitioner, he had been provided with a memorandum of an interview with Kim Bowen that included useful information. He said, however, he was unaware at that time how much information she had about the Petitioner. Dr. Caruso maintained that counsel never requested he speak to Ms. Bowen or any other witness, and he had not appreciated, at the time, how good a resource Ms. Bowen would have been from the information included in the memorandum. Before testifying at the post-conviction hearing, Dr. Caruso spoke to Ms. Bowen for approximately ninety minutes. Ms. Bowen provided information regarding the Petitioner's manic episodes and stated the episode during the time of the killings was as severe as she had ever witnessed. Dr. Caruso said the symptoms Ms. Bowen mentioned changed the view of the Petitioner's condition from hypomania to mania, which is a more severe condition.

Dr. Caruso said that, at the time of his trial testimony, he did not appreciate that many of the Petitioner's prior criminal offenses were clustered during certain time periods. Dr. Caruso noted that the Petitioner's criminal history included the passing of many bad checks in a short period of time, which was not evident from the criminal records. He stated that the evidence suggested that much of the Petitioner's prior criminal behavior may have occurred during manic episodes.

On cross-examination at trial, Dr. Caruso opined that the Petitioner was competent to stand trial and was not insane at the time of the offense. When the doctor testified at the penalty phase, Dr. Caruso was unaware the Petitioner also had brain damage.

Dr. Caruso identified the Petitioner as having various symptoms such as racing thoughts, decreased need for sleep, impulsivity, and distractibility. Dr. Caruso testified that Ms. Bowen, whom the Petitioner contacted before the homicides, stated the Petitioner had been very grandiose when talking to her over the telephone, that he fluctuated between being very excited and very irritable, and that he was speaking rapidly. Ms. Bowen stated the

36

Petitioner was also "somewhat paranoid." She informed Dr. Caruso that she had never seen evidence of paranoia with the Petitioner on prior occasions, even when he was severely ill. Dr. Caruso testified that paranoia is not a usual symptom of hypomania and that paranoia suggests the person is losing touch with reality and becoming psychotic, which would only occur in a manic state and not in a hypomanic state. Dr. Caruso said, "I don't think it ever got to the point where [the Petitioner] was having a delusion or hallucinations, but it really spoke to me about how much more severely ill he was than I had initially thought, based on his self-report and the other data that I'd seen."

Dr. Caruso explained that environmental factors played a role in the Petitioner's psychological illness, including poverty and lack of education. The Petitioner repeated the first and seventh grades and dropped out of school in the ninth grade. He was raised in a home of chaos with no real stability. His mother was frequently absent from the home, leaving his older sister in charge of the Petitioner. Dr. Caruso stated that the dissolution of the Petitioner's family left him sensitive to abandonment. The Petitioner was also physically abused as a child. Dr. Caruso testified the stressors that precipitated the Petitioner's manic episode were the potential loss of his childhood, his return to poverty, and possible abandonment. Dr. Caruso noted the Petitioner was about to lose his trailer because he was two payments behind, his marriage was disintegrating, and he sought out Ms. Bowen who rejected him. Dr. Caruso said these situations were painful for the Petitioner and precipitated the manic episode.

Dr. Caruso opined that, because the Petitioner was manic and had brain damage, he could not premeditate the killing of the victim. Dr. Caruso testified that with the additional information that he had, he believed the Petitioner's capacity was diminished at the time he committed the offense. The doctor stated his opinion is not that the Petitioner was not able to plan but that "the planning occurred in a state of excitement and passion that was really impairing." Dr. Caruso explained that when the Petitioner's credit card was denied, he felt trapped and made a "split-second decision." Dr. Caruso further explained that those with bipolar disorder and brain damage have more difficulty in making a "split-second decision" than those without these afflictions. Dr. Caruso said "having been abused as a child, there is this lesson in emotional moments that teaches you violence is problem-solving as a way out. Furthermore, there is no other way out to him at that particular moment. There's nothing else that occurs to him."

Dr. Caruso testified that the Petitioner's judgment and impulse control were not imminently impaired on the day in which the doctor evaluated him. Dr. Caruso stated he noted in his report that the Petitioner's "high cognitive function was generally intact, scoring 30-30 on the Folstein Mini-Mental Status Examination," which is the highest score possible on the test. Dr. Caruso explained the test "doesn't pick up real well on frontal lobe damage."

The doctor said that, at the time of the evaluation, the Petitioner was no longer in a manic episode but was depressed. Dr. Caruso estimated the Petitioner was of average intelligence based upon his vocabulary and his capacity for abstract thought.

Dr. Robert Shaffer, a clinical psychologist in the northern suburbs of Atlanta, Georgia, testified that he had a bachelors degree and masters degree in psychology and a doctorate in clinical psychology. Dr. Shaffer had training in forensic psychology and neuropsychology and a variety of experience performing neuropsychological testing. He stated he was not board certified in the area of neuropsychology but that a board certification in the area is not required in Tennessee. The post-conviction court admitted Dr. Shaffer as an expert in the field of clinical psychology and neuropsychology and noted Dr. Shaffer's training or lack of it related to the weight of his testimony.

Dr. Shaffer testified that he examined the Petitioner for a total of ten hours at the jail. He also reviewed the Petitioner's correctional records, social history records, mental health records, and documents from the prison health service where he was incarcerated. Dr. Shaffer submitted a report of his assessment. He noted that, in preparing a report, time lines were not as useful as a social history, which described the events and grouped the events according to issues that the doctor could quickly examine and determine symptom patterns.

Dr. Shaffer testified that five factors created pathological conditions that contributed to the Petitioner's psychological state. First, a genetic family history of mental illness existed, which was significant to predispose a person to develop a type of illness such as bipolar disorder. Dr. Shaffer testified that, second, the Petitioner had an absence of maternal attachment and that the relationship with the mother had proved to be important in later conduct and behavior. Third, the Petitioner was subject to childhood neglect with physical abuse. Dr. Shaffer noted that, in the Petitioner's family, there was an absence of care in the home, absence of parenting, and physical abuse. Fourth, the Petitioner was subject to frequent residential and school changes as a child. Dr. Shaffer stated clinical literature shows that many school changes and residential changes result in poor adaptation in life in a variety of issues. Finally, the Petitioner had multiple closed-head injuries, which can have a cumulative effect that can significantly impact behavior. Dr. Shaffer testified each of the five factors have well-documented research that shows casual affect on violent behavior. He explained "in and of themselves, each one may not seem that significant and may not be that significant, because people every day live with one or two of those factors and don't get in trouble. However, when all factors combine, the predictability of a violent situation is better than chance, certainly."

Dr. Shaffer also obtained a medical history as part of his evaluation. He noted the Petitioner's mother had an extremely difficult pregnancy with emotional distress and marital

conflict due to infidelity. He explained such emotional distress creates stress hormones in the presence of the mother and the fetus, and that the fetus can become conditioned to those biochemicals during pregnancy.

Dr. Shaffer testified that, after the Petitioner was born, it was reported he fell from his crib onto concrete and landed on his forehead and that his eyes were dilated. Soon thereafter, the Petitioner was ejected from a moving vehicle onto the street and was rendered unconscious and limp for approximately five minutes. At age four, the Petitioner fell out of a car window and hit his head on a concrete culvert. Dr. Shaffer stated several people reported the Petitioner's mother struck him with her fists, skillet, or other available objects and she once slammed the Petitioner's head into a brick wall. When the Petitioner was eight years old, he had a series of two or three more head injuries within the same year. The Petitioner reported to Dr. Shaffer that one of the injuries occurred while he was playing a game with a friend where they would run at each other full speed and collide their heads together to determine who had the hardest head. The Petitioner further reported to the doctor that another injury occurred when he jumped out of a moving ice cream truck and struck his head on the pavement and yet another when he struck his head on a windowsill while jumping on the bed.

Dr. Shaffer testified that re-injury can continue the trajectory of problems with a damaged brain and also interfere with the growth of new parts of the brain in a developing youth. Dr. Shaffer acknowledged there was no evidence of a coma or laboratory brain scans conducted at that time. The doctor stated that, at age twenty, the Petitioner was ejected from a motorcycle while traveling at a high rate of speed which could result in some degree of head injury. At age sixteen, the Petitioner had severe gastroenteritis, dehydration, and fever for three days. Dr. Shaffer explained "hospital stays are associated with . . . impairment of brain functioning as well when there's a high fever for a period of time like that." Dr. Shaffer testified that, during a time when the Petitioner's frontal lobes should have been developing, he sustained continued injuries that were compounded by a series of injuries over his life. Dr. Shaffer opined "there's a strong likelihood that you would expect to see some kind of behavioral results because of brain injury.

Dr. Shaffer testified that, on both the paternal and maternal side of the Petitioner's family, there were a number of relatives who displayed symptoms consistent with mania or bipolar disorder. Dr. Shaffer noted the Petitioner's maternal grandfather was sexually aggressive and molested the Petitioner's mother and her sisters. Dr. Shaffer noted evidence that the Petitioner's mother was involved in multiple relationships with different men at the same time. The doctor said the grandiosity or expansive mood state that allows a woman to think that she can have multiple relationships at the same time is another symptom of mania. The Petitioner's paternal grandmother was a victim of excessive family sexuality and set fire

39

to all of her belongings. Dr. Shaffer stated the Petitioner's sister attempted suicide and was placed in a mental health facility because she was upset and highly aggressive, which is typical of those suffering from mania. The Petitioner's niece was diagnosed with oppositional defiant disorder and later bipolar disorder.

Dr. Shaffer testified the Petitioner was born with a gastrointestinal disorder that caused him to projectile vomit. This disorder causes a baby pain even when the mother is attempting to comfort the baby. Dr. Shaffer said the Petitioner's mother was not in an emotionally secure place and was not a calm presence for the Petitioner as a baby. Dr. Shaffer testified there was also evidence that the Petitioner was developing a social attachment disorder and a later emerging psychotic disorder as he would smear his feces on the wall. The doctor said that, as a result, the Petitioner was less attractive to his mother as an infant, which likely affected his development.

Dr. Shaffer opined the Petitioner likely had ADHD as a child. The doctor noted that the Petitioner's father described him as being "antsy." School records indicated the Petitioner was not able to attend class and was restless and very hyperactive, all of which are typical symptoms of ADHD. He explained children with ADHD are more likely to display symptoms of bipolar disorder and bipolar disorder does not typically arise until young adulthood.

Dr. Shaffer testified that about the abuse and neglect the Petitioner suffered as a child, saying the Petitioner's father threw him down the stairs on one occasion. On another occasion, the Petitioner's father picked him up by his arm and yanked him around. Dr. Shaffer noted that the Petitioner's mother was not available during his childhood, and his father left the family on the Petitioner's seventh birthday. The Petitioner's older sister, Sherri, was placed in charge of him when she was six or seven years old and the Petitioner was four years old. Dr. Shaffer further noted the Petitioner's mother did not want to care for him and left him in the care of others. She left him in the care of Daniel Copley, who had a history of violent behavior, raped his wife, and was accused of molesting his daughter. Mr. Copley kicked the Petitioner in the head on one occasion and punched him in the head on another occasion. Dr. Shaffer said one of the Petitioner's mothers' boyfriends also kicked the Petitioner in the head. Another boyfriend pulled a revolver on the Petitioner and made him and his sisters hold a broomstick in the air over their heads for an extremely long period of time.

Dr. Shaffer testified the Petitioner had fifteen residence changes and eight school changes by the time that he was in the eighth grade. Dr. Shaffer explained that research shows such changes result in poor school performance and worse psychological adjustment, as well as more depression and anxiety and worse behavioral patterns. The doctor noted all

of the moves were made without warning to the Petitioner.

Dr. Shaffer testified he met with Kim Bowen, who was at one time the Petitioner's girlfriend, and who confirmed the Petitioner's bipolar symptoms. Ms. Bowen stated the Petitioner was taking lithium to control the symptoms. She recalled an occasion when the Petitioner was out of town without his medication and developed symptoms. The Petitioner was driving back home and attempted to exit off the freeway, but he kept missing the exit and continued to drive faster each time. By the time police officers stopped him, the Petitioner was traveling 140 miles per hour. Dr. Shaffer said this instance is typical of a person who is manic, as well as a symptom of brain injury, particularly in the frontal lobes which control the ability to anticipate consequences.

Dr. Shaffer stated that those with bipolar disorder frequently stop taking medication. The doctor explained that one of the symptoms of bipolar disorder is grandiosity, a belief that the person knows better than everyone else what he or she needs. He said that people who have manic grandiosity tend not to follow a doctor's advice and tend to stop taking their medication.

Dr. Shaffer administered neuropsychological tests to the Petitioner. Dr. Shaffer opined that in four specific measures related to frontal lobe brain injury, the Petitioner showed particular difficulty. The tests indicated that other areas of the brain, like the occipital and the parietal lobes, were not significantly impaired.

Dr. Shaffer administered the "go, no-go" procedure, which is characteristic of several tests that measure frontal lobe activity. He explained a subject is conditioned to perform a response and then he is required to hold back from that response in a complex stimulus situation. The procedure tests impulse control. The first test is called the Stroop test in which an individual is presented with printed words on a page and each word is a name of a color. Each word is printed in different colored ink which does not necessarily match the name of the color printed on each card. In the first trial, the person is asked to read the words and ignore the colors, and the number of words correctly read in two minutes is tallied. In the second trial, the person is asked to name the color of the print and ignore the word. Dr. Shaffer stated that on the Stroop test, the Petitioner's performance "indicated a probability of 92 percent that he matches the population of individuals that have been identified as having a brain injury."

Dr. Shaffer testified he also administered the cancellation test to the Petitioner, which requires the subject to mark with a pencil forms that have a designated shape and color. For example, the form may include a red square or a blue circle. Dr. Shaffer testified a person with frontal lobe injury finds it difficult to ignore the color that he or she is marking when

41

it is in a different shape or ignore the shape that he or she has been marking when it is in a different color. Dr. Shaffer opined that the Petitioner's performance fell within the fifth percentile in that his performance would be exceeded by 95 of 100 individuals who take the test.

Dr. Shaffer also administered the "Tower of London" test to the Petitioner. The doctor explained the test involves three pegs with different colored beads and that the subject is required to match certain patterns of the beads set up by the doctor in as few moves as possible. Dr. Shaffer said those with frontal lobe injuries move the beads from peg to peg until they get a solution. The Petitioner's total move count was below the first percentile. His additional moves resulted in excessive time of completion, and he scored at the second percentile.

Dr. Shaffer stated he administered to the Petitioner the Wisconsin card sorting test, in which the subject must choose a card from a deck and place it below one of the four cards that it matches. Dr. Shaffer said the Petitioner failed to maintain the correct scoring category on three occasions. The doctor opined that the Petitioner's failure "shows an inability to hold to a solution even when it's functioning and it's in place." Dr. Shaffer also tested for malingering and concluded the Petitioner's test results were reliable and valid. Dr. Shaffer concluded the Petitioner had difficulty anticipating a consequence of an act that he was about to perform and shifting behavior tracks.

Dr. Shaffer testified the Petitioner was genetically predisposed to bipolar disorder and that, as a result, he was highly likely to develop that disorder. He further testified the Petitioner's continual brain injuries damaged his brain as it was developing, making his behavior more difficult to control, and also resulted in the lack of development of the frontal lobes in an appropriate manner. Dr. Shaffer explained the frontal lobes are the most important aspect of governing behavior. He further explained that with the bipolar disorder and the brain damage, "you're just looking at raw animal instinct who lives right in the moment for physical gratification."

Dr. Shaffer testified that, during the criminal episode, the Petitioner had a high level of anxiety and fearfulness causing much adrenalin. Dr. Shaffer explained the Petitioner was anticipating he would be required to defend himself, and as a result, he would react with aggressive self-defensive behavior even in a situation where such behavior was unnecessary. Dr. Shaffer stated such behavior is typical for someone with this type of mental illness with a manic disorder. He said that, due to attachment disorder, the Petitioner had a real fear of abandonment, and a person with such a disorder can become mentally disorganized without the right kind of affection. Dr. Shaffer further stated that at the time of the events, the Petitioner had been kicked out of his home by his wife and rejected by Ms. Bowen. Dr.

42

Shaffer opined the Petitioner had the inability to see others as valuable human beings at that moment.

Dr. Shaffer admitted he did not know if he would expect the Petitioner's behavior during the ten-day crime spree to be consistent. Dr. Shaffer stated that the Petitioner's actions, when he did not harm a grandmother, a mother, and a child, are not inconsistent with his diagnosis. The doctor explained he was not "going to rule out that some choice is operating, but it's very clear to me that the choices are severely limited and narrowed in his situation." He further explained that, on one occasion, the Petitioner may have more control than on another occasion and that both the brain impairment and the bipolar disorder interfere with choices at different times. Dr. Shaffer admitted that, at some point in his life, the Petitioner was aware that medication could control the bipolar symptoms.

Rick Kammen, an attorney who practiced in Indianapolis, Indiana, testified that a large portion of his cases are capital punishment cases in state and federal court. The post-conviction court admitted Mr. Kammen as an expert in the area of death penalty defense. Mr. Kammen testified that, with regard to the Petitioner's case, he reviewed the technical record, the transcript of evidence, reports by Inquisitor of witness interviews, and notes taken by Co-Counsel during jury selection.

Mr. Kammen testified that expectations of attorneys in capital cases arise from two sources, state law and the decisions of the United State Supreme Court. Mr. Kammen said the most significant standard had been developed by the American Bar Association. The ABA published guidelines in February 2003, approximately one year after the Petitioner's trial. The guidelines published in 2003 were a detailed codification of the guidelines and standard of practice that had existed for many years. Mr. Kamman stated that, although the standards for attorneys in capital cases in 2002 may have been better described in the 2003 guidelines, the standards had not changed in a significant manner in years.

Mr. Kammen testified that, in preparing for a capital punishment case, trial counsel should develop a defense team, which includes co-counsel, investigators, and, in some circumstances, mental health experts. Mr. Kammen stated trial counsel have an obligation to coordinate and communicate with the defense team. The goal is to have as many of the team members as possible provide information so that the best decisions can be made. Mr. Kammen noted that, although the Petitioner's trial Counsel assembled a defense team, there was no coordination or communication with the members.

Mr. Kammen opined that trial counsel were deficient in failing to make a record regarding issues in jury selection and the change of venue. He noted half of the jurors were excluded for cause and other jurors who remained on the panel stated that if they convicted

43

the Petitioner of first degree murder, they would impose the death penalty. Mr. Kammen questioned why trial counsel would challenge a juror for cause if he believed that the juror would be favorable. He stated that once the trial court denies a challenge for cause, counsel must exercise a peremptory challenge in order to preserve the issue for appeal. Counsel must also use all peremptory challenges in order to preserve the issue of the change of venue. Mr. Kammen stated he reviewed the transcript of Counsel's oral argument in the appellate court and the appellate opinions and opined Counsel's performance during oral argument was deficient.

Mr. Kammen was aware that, in addition to the murder charge in Tennessee, the Petitioner was accused of two other murders that occurred within the same ten-day period. Mr. Kammen testified he "would never say that a lawyer was ineffective for wanting to exclude from the jury's consideration two other murders. Clearly, that would be preferable." He noted that there are times in which an attorney must "bite the bullet" and present such evidence in order to explain the whole story. Mr. Kammen further noted the trial court had ruled that the evidence of the stolen vehicle and stolen credit card were admissible, as well as evidence that the Petitioner was wanted in other jurisdictions. Mr. Kammen said the Petitioner's deterioration that occurred near Christmas of 1999 seemed to have resulted from some of the financial issues that were raised by the Petitioner's wife. He stated, "it seems to me that you have a long history of bipolar behavior way predating this and then the episode that occurred, which, given the way the case played out, the story would have been the same." Although Mr. Kammen did not necessarily believe trial counsel would have or would not have opened the door to the other murders, he recognized there would be a point where trial counsel could open the door, which he agreed should be avoided.

Mr. Kammen testified that, to avoid opening the door to other offenses, trial counsel should either file a motion in limine or reach a stipulation with the prosecutor. Either course should be done prior to trial in order to prepare trial strategy and avoid opening the door to allow the State to present evidence or question witnesses regarding the other offenses. Mr. Kammen stated the decision to avoid evidence of the prior murders is a "sound tactical decision." He acknowledged that one of the aggravators upon which the State initially relied was the "mass murder" aggravator, but the State disregarded this aggravator as it was prohibited from presenting evidence of the other murders. Mr. Kammen said as a result, he would be more hesitant to open the door to the prior murders as the State would then be allowed to use the evidence to prove one of the aggravators. Mr. Kammen reiterated he is not "by any means faulting the decision to try and avoid opening the door to the Oklahoma and Missouri murders."

Mr. Kammen testified it is difficult for an attorney to determine in the abstract the importance of neuropsychological testing in developing a diminished capacity defense. Mr.

Kammen stated the Petitioner clearly suffered from bipolar disorder and had prior head injuries. Mr. Kammen further stated head injuries often produce brain damage and significant brain damage along with bipolar disorder could change the diminished capacity equation. Mr. Kammen opined that neuropsychological testing leading to findings that Petitioner had brain damage in the frontal lobe would have enhanced a diminished capacity defense. He testified that, even if the Petitioner was convicted, the evidence presented at trial would have flowed differently into the penalty phase.

Mr. Kammen said trial counsel are responsible for ensuring that the experts have the necessary information to reach their conclusions. He admitted it appeared that Dr. Caruso had all the information the investigators developed in the case prior to rendering his opinion. Dr. Caruso acknowledged bipolar disorder is a severe mental disease, but he could not opine that the disease prevented Petitioner from forming the requisite mens rea. Mr. Kammen further admitted expert testimony is required as evidence of diminished capacity, and Dr. Caruso could not provide that testimony at the time.

Mr. Kammen testified he was familiar with what is required in capital punishment cases in order to obtain funding for experts. He stated that, although Dr. Caruso's report does not specifically indicate the need for additional testing, information is included in the report that could be used to support a request for neuropsychological testing. He said Dr. Caruso sent a letter to trial counsel stating that if they wanted to cover all bases, neuropsychological testing and an MRI or CT scan would be recommended. However, Dr. Caruso acknowledged in his letter that the medical records did not substantiate the need for the testing and that Petitioner's descriptions of the events in his statement to police officers and interviews with the doctor do not suggest structural brain impairment. Mr. Kammen testified Dr. Caruso provided trial counsel with an affidavit including very specific recommendations.

Mr. Kammen opined that trial counsels' investigation for the penalty phase and their coordination of the evidence presented and elicited in the penalty phase was "highly deficient." Mr. Kammen further opined that trial counsels' failure to coordinate the presentation between the guilt/innocence phase and the penalty phase was also deficient. Mr. Kammen explained that, despite the trial court's instructions to the contrary, jurors tend to make the decision of life or death at the same time they are making the decision of guilt or innocence. He stated that, as a result, trial counsel should "front load the mitigation" by presenting penalty phase material in the guilt/innocence phase. Mr. Kammen testified that evidence of the Petitioner's bipolar disorder and erratic behavior would not be a successful defense, "[b]ut in terms of using that as a way of beginning to sensitize the jury to the mental health evidence, that's certainly preferable than self-defense that can't even possibly be—can't even meet the instructions for self-defense." Mr. Kammen opined that, since the trial court

ruled that evidence of bipolar disorder does not open the door to the other murders during the penalty phase, it would not open the door in the guilt/innocense phase. Mr. Kammen acknowledged that, regardless, the goal would be to avoid opening the door to allow evidence of the other murders. Mr. Kammen stated that in a situation where counsel expects the client to be convicted, the standard of practice is not to present a "throw away defense" of innocence.

Mr. Kammen stated the investigation into the client's social history is part of a capital punishment case. The investigation can be used to determine which witnesses and records need to be developed into a time line and presented to the jury. Mr. Kammen noted a person against whom the death penalty is sought almost always suffered profound damage as a child. He testified the investigation generally requires more than one in-person interview with each of the critical witnesses, family members, and close friends. Mr. Kammen explained that a relationship must be built with the family as they generally do not wish to be involved in the case. He further explained that information of family dysfunction is never obtained on the first interview due to the sensitive nature of the information and that such information may never be obtained in some cases.

Mr. Kammen testified that during the penalty phase, trial counsel questioned the victim's widow on cross examination regarding the victim's yearly income of $15,000 and the life insurance policy of $250,000. The subtext of the questioning was that the financial situation of the victim's widow had improved since his death. Mr. Kammen stated that such a line of questioning inflamed the jury. Mr. Kammen also noted Ms. Shettles's testimony regarding the cost of imprisoning a defendant for life was presented in such a way that it helped the prosecutor. Mr. Kammen stated that the prosecutor's cross examination of Ms. Bowen identified the symptoms of bipolar disorder and the prosecutor was effective in suggesting that Petitioner knew right from wrong.

Based upon this evidence, the post-conviction court found that the Petitioner's trial counsel were not ineffective, and it dismissed the petition for post-conviction relief.

## II. Analysis

On appeal, the Petitioner contends that: (1) he received the ineffective assistance of counsel during his trial; (2) he received the ineffective assistance of counsel on appeal; (3) the sentence of death violates his constitutional rights; (4) the aggravating circumstances of his case do not preclude a finding that he was prejudiced by his trial counsels' performance; and (5) he is entitled to post-conviction relief based upon the cumulative effect of trial counsels' errors.

46

The Petitioner's post-conviction petition is governed by the Post-Conviction Procedure Act. T.C.A. §§ 40-30-101 to -122 (2006). To obtain post-conviction relief, the Petitioner must show that his conviction or sentence is void or voidable because of the abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). Petitioner must establish the factual allegations contained in his petition by clear and convincing evidence. T.C.A. § 40-30-110(2)(f) (2006).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. *Wallace v. State*, 121 S.W.3d 652, 656 (Tenn. 2003); *State v. Nichols*, 90 S.W.3d 576, 586 (Tenn. 2002) (citing *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999)). This Court may not reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. *Nichols*, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. *Id.* (citing *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of a petitioner to show that the evidence preponderated against those findings. *Clenny v. State*, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. *Wallace*, 121 S.W.3d at 656; *Nichols*, 90 S.W.3d at 586. As such, the findings of fact are reviewed under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001) (citations omitted). In clarifying the standard, our Supreme Court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). *Fields*, 40 S.W.3d at 456.

## A. Ineffective Assistance of Counsel at Trial

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn.1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient

performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687; *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n. 38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the second prong in *Strickland*." *State v. Zimmerman*, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). Moreover, when challenging a death sentence, the petitioner must show that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695). Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Strickland*, 466 U.S. at 697; *Goad*, 938 S.W.2d at 370. Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

In this case, the Petitioner maintains that trial counsel rendered ineffective assistance at trial. Specifically, he contends trial counsel failed to: (1) request neuropsychological testing; (2) communicate with and prepare Dr. Caruso for his testimony; (3) utilize the services of a mitigation specialist; (4) utilize the defense team in an effective manner; (5) conduct meaningful voir dire and preserve for appeal the denial of various challenges for cause and the denial of a change of venue; (6) present sufficient social history mitigating evidence; (7) present a cohesive theory of defense; and (8) object to and request certain jury instructions.

### 1. Failure to Request Neuropsychological Testing

The Petitioner contends trial counsel were ineffective in failing to request neuropsychological testing. The Petitioner argues neuropsychological testing would have shown that he suffered from brain damage and, thus, would have supported a diminished capacity theory during both the guilt/innocence phase and the penalty phase.

Although counsel does not have a constitutional duty to offer mitigation evidence at the penalty phase of a capital trial, counsel does have a duty to investigate and prepare for both the guilt and penalty phases. *See Goad*, 938 S.W.2d at 369-70. Counsel does not have an absolute duty to investigate particular facts or a certain line of defense; however, counsel does have a duty to make a reasonable investigation or to make a reasonable decision that makes a particular investigation unnecessary. *Strickland*, 466 U.S. at 691. In determining whether counsel breached this duty, this Court reviews counsel's performance for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as viewed from counsel's prospective at that time. *Wiggins v. State*, 539 U.S. 510, 523 (2003) (citations omitted). Counsel is not required to

49

investigate every conceivable line of mitigation evidence regardless of how unlikely the effort would be to assist the defendant at sentencing. *Id.* at 533. Likewise, counsel is not required to interview every conceivable witness. *Hendricks v. Calderon*, 70 F.3d 1032, 1040 (9th Cir. 1995). This Court will not conclude that counsel's performance is deficient for failing to unveil all mitigating evidence, if, after a reasonable investigation, counsel has not been put on notice of the existence of that evidence. *See Babbit v. Calderon*, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted).

In addition, the United States Supreme Court has held that:

> [N]o particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential.

*Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (internal citations and quotations omitted).

We review the following factors in determining whether trial counsel were ineffective in failing to present mitigating evidence: (1) the nature and extent of the mitigating evidence that was available but not presented by trial counsel; (2) whether trial counsel presented substantially similar mitigation evidence to the jury in either the guilt or penalty phase of the proceedings; and (3) whether the evidence of applicable aggravating factors was so strong that mitigating evidence would not have affected the jury's determination. *Goad*, 938 S.W.2d at 371 (citations omitted).

The post-conviction court in this case found that trial counsel had no basis upon which to request funding for neuropsychological testing in accordance with Tennessee Supreme Court Rule 13 and *State v. Barnett*, 909 S.W.2d 423, 430 (Tenn. 1995). Due process of law principles require the appointment of expert assistance at trial when the defendant establishes that such assistance is necessary to conduct a constitutionally adequate defense. *See Barnett*, 909 S.W.2d at 426-28. The Tennessee Supreme Court has held that "while a State need not provide an indigent defendant with all the assistance his wealthier counterpart might buy . . . fundamental fairness requires a State to provide an indigent defendant with the 'basic tools of an adequate defense on appeal.'" *Id.* at 426 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)).

The obligation, however, of a trial court to afford an indigent defendant with the benefit of expert assistance does not arise unless the defendant makes a threshold showing of a "particularized need" for the expert assistance. *See* Tenn. Sup. Ct. R. 13, § 5(c)(1);

*Barnett*, 909 S.W.2d at 430-31.  In the context of criminal trials and appeals, particularized need is established:

> when a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

Tenn. Sup. Ct. R. 13, § 5(c)(2).  Particularized need cannot be established and the trial court should deny funding requests when the motion for such funding includes only:

> (A) undeveloped or conclusory assertions that such services would be beneficial;
> (B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;
> (C) information indicating that the requested services relate to factual issues or matters within the province or understanding of the jury; or
> (D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

*Id*. at (c)(4).   Unsupported assertions that an expert is necessary to counter proof offered by the State is not sufficient to establish particularized need.  *Barnett*, 909 S.W.2d at 431.  The petitioner must refer to the facts and circumstances of the particular case and demonstrate that the appointment of the expert is necessary to insure a fair trial.  *Id*.  The issue of whether a petitioner has made the threshold showing is to be determined on a case-by-case basis.  *Id.*

In the present case, Dr. Caruso was provided with and considered more than ninety different sets of records and memoranda about the Petitioner, including medical records. Following his review of these records and his evaluation of the Petitioner, Dr. Caruso prepared a report opining that, although the Petitioner had bipolar disorder, a diminished capacity claim could not be supported.  The report also provided that testing showed the Petitioner's higher cognitive functions were generally intact.  Along with the report, Dr. Caruso enclosed a letter to Counsel stating:

> Although [the Petitioner] and his family gave abundant accounts of his suffering closed head trauma, medical records did not substantiate this.  His descriptions of the events in his statement to police and my interviews with him do not suggest any structural brain impairment.  However, if you wish to cover all bases, neuropsychological testing and MRI or CT of the brain would be recommended.

Other than Dr. Caruso's limited suggestion, there were no "particular facts and circumstances" to indicate that the neuropsychological testing was necessary. According to Dr. Caruso's letter to Counsel, medical records did not support the need for such testing. While the Petitioner contends Dr. Caruso was mistaken in his letter regarding the medical records, trial counsel cannot be faulted for relying upon an expert's assessment of medical records, especially when Dr. Caruso's letter and report both stated that he did not detect brain damage. All the facts and circumstances when considered together demonstrate that any funding for neuropsychological testing would have been sought in the mere "hope or suspicion" that favorable evidence could be obtained. *See Barnett*, 909 S.W.3d 431 (upholding the trial court's denial of funding for a psychiatrist when the facts in support of funding only established the mere "hope or suspicion" that favorable evidence could be obtained from an evaluation). Such "hope or suspicion" does not rise to the level of particularized need. Further, even if trial counsel had sought funding for neuropsychological testing based upon this information, the trial court would likely have denied the motion given the available information at the time.

The Petitioner maintains that Counsel and Co-Counsel would have discovered facts supporting the motion if they had investigated further. Dr. Caruso's report stated he was provided with and reviewed more than ninety different sets of materials in evaluating the Petitioner. Both his report and his letter to Counsel state that he did not detect brain damage. Rather, Dr. Caruso concluded that the Petitioner suffered from bipolar disorder, "a severe mental disease . . . which substantially impaired his capacity to control his behavior." Dr. Caruso only suggested neuropsychological testing "to cover all bases." Based upon the information provided to trial counsel by Dr. Caruso, trial counsel were not deficient in declining to continue to investigate the possibility of brain damage and choosing to focus upon the chemical imbalance of the Petitioner's bipolar disorder. The Petitioner is not entitled to relief with regard to this issue.

## 2. Failure to Communicate with and Prepare Dr. Caruso for His Testimony

The Petitioner contends trial counsel were ineffective in failing to communicate with and prepare Dr. Caruso for his testimony. He asserts that, as a result, Dr. Caruso was unable to testify about the severity of the Petitioner's mental illness, brain damage, and social history.

Based upon Dr. Caruso's review of more than ninety sets of records provided by the defense team and his interviews with the Petitioner, Dr. Caruso concluded that the Petitioner suffered from a hypomanic episode at the time of the offense. Dr. Caruso testified at the post-conviction hearing that he did not fully appreciate the Petitioner's symptoms and that, after speaking with Ms. Bowen, and the other doctors reviewing the case, he believed that

the Petitioner suffered from a manic episode at the time of the offense. Dr. Caruso faulted trial counsel for failing to request an interview with Ms. Bowen. At the time of the evaluation, however, Dr. Caruso had been provided a memorandum of an interview with Ms. Bowen that showed that she was the Petitioner's former girlfriend, whom he was dating at the time he was diagnosed with bipolar disorder, and that the Petitioner had contacted Ms. Bowen before committing the offenses. The memorandum also included Ms. Bowen's contact information. Trial counsel did not prevent Dr. Caruso, a board-certified forensic psychiatrist who is trained to recognize different episodes of bipolar disorder and has experience evaluating defendants and testifying at trial, from contacting Ms. Bowen to further question her regarding the Petitioner's symptoms. While Dr. Caruso testified at the post-conviction hearing that he failed to fully appreciate the Petitioner's symptoms, trial counsels cannot be faulted for Dr. Caruso's performance. *See Byron Lewis Black v. State*, No. 01C01-9709-CR-00422, 1999 WL 195299, at *15 (Tenn. Crim. App., at Nashville, Apr. 8, 1999), ("The attorneys are not guarantors of the validity of an expert's results."), *perm. app. denied* (Tenn. Sept. 13, 1999).

The Petitioner asserts trial counsel failed to properly prepare Dr. Caruso for his testimony during the penalty phase and that, as a result, he was not allowed to testify to additional details of the Petitioner's social history due to fears expressed by the trial court, the prosecutor, and trial counsel that he would open the door to evidence of the Oklahoma and Missouri murders. Addressing this issue, the post-conviction court found that trial counsel should have met with Dr. Caruso and better prepared him to testify but that the Petitioner was not prejudiced by trial counsel's failure to do so.

During the penalty phase, Dr. Caruso testified that the Petitioner suffered from bipolar disorder and a personality disorder with borderline and antisocial traits. Dr. Caruso stated that people with such personality disorders have "problems controlling their behavior and behaving in maladaptive ways." With regard to the Petitioner's bipolar disorder, Dr. Caruso explained:

> Well, I think that bipolar disorder is the severe mental disease. In addition, there was extreme mental or emotional disturbance. In fact, there were a number of stressors, based on Mr. Thacker's history of abandonment and rejection, would again provoke him into a state of extreme emotional disturbance, in addition to the underlying mental disorder that he has, in additional to bipolar disorder.

Although the Petitioner claims Dr. Caruso was limited in his testimony regarding the Petitioner's social history, Dr. Caruso did testify that the Petitioner, his mother, and his sister were sent back to the United States from the Air Force base where his father was stationed

due to his mother's infidelity, and his parents divorce soon thereafter. Dr. Caruso was allowed to testify that the Petitioner's mother worked two jobs and was not around and that his seven-year-old sister became the primary caretaker in the home when the Petitioner was five years old. Dr. Caruso was also allowed to testify regarding the lack of involvement of the Petitioner's father in his life and the incident when the Petitioner's stepmother kicked him and his sister out of her home. Before Dr. Caruso's testimony, the defense presented the testimony of Ms. Bowen and Crystal St. Clair, both of whom testified about the Petitioner's symptoms of bipolar disorder, and the testimony of Roxanne Evans, the Petitioner's paternal aunt who testified about the Petitioner's childhood.

While we agree with the trial court that trial counsel should have meet with Dr. Caruso and better prepared him for his testimony, the Petitioner has not shown he was prejudiced. The jury heard evidence supporting the Petitioner's position that his mental illness and social history should mitigate the punishment and that the death penalty should not be imposed. The jury rejected this proof, finding that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death. As found by the post-conviction court, evidence of the aggravating circumstances was strong, and any additional details of the Petitioner's social history or any additional explanation or analysis by Dr. Caruso that may have been presented would not have significantly added to the mitigation proof that was actually presented at trial. The Petitioner is not entitled to relief on this issue.

### 3. Failure to Utilize the Services of a Mitigation Specialist

The Petitioner contends trial counsel were ineffective in failing to utilize the services of a mitigation specialist. The Petitioner notes trial counsel considered Ms. Shettles only to be a mitigation investigator, and Co-Counsel assumed the role of mitigation specialist. The Petitioner avers a mitigation specialist would have identified important issues, recommended experts, and aided in the presentation of mitigating evidence to the jury.

There is no per se requirement that trial counsel retain experts in every capital case. *Kevin B. Burns v. State*, No. W2004-00914-CCA-R3-PD, 2005 WL 3504990, at *67 (Tenn. Crim. App., at Jackson, Dec. 21, 2005), *perm. app. denied* (Tenn. Apr. 24, 2006). This Court has declined adoption of a "rigid checklist of tasks that defense counsel must perform in all cases because 'no particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" *Id.* (quoting *Strickland*, 466 U.S. at 688-89). Due to this fact and the "constitutionally protected independence of counsel," trial counsel is granted broad discretion in determining whether the retention of an expert will serve the client's interests. *Id.* at *189; *see Wiggins*, 539 U.S. at 533. A

mitigation specialist is not the exclusive means through which counsel can investigate a defendant's background in a thorough manner. *Burns*, 2005 WL 3504990, at *67. Rather, counsel has other available resources that may be utilized in conducting a background investigation, including the defendant, family, friends, coworkers, and counsel's own experience. *Id.* at **67.

In the present case, trial counsel retained the services of Glori Shettles and Julie Hackenmiller, both of whom were experienced mitigation specialists. Trial counsel utilized Ms. Shettles and Ms. Hackenmiller to interview the Petitioner's family, friends, former employers, and other potential mitigation witnesses, as well as to retrieve records and investigate the Petitioner's background. Ms. Shettles and Ms. Hackenmiller provided Dr. Caruso with more than ninety sets of documents to review in evaluating the Petitioner.

Based upon the information gathered by Ms. Shettles and Ms. Hackenmiller, trial counsel decided to rely upon evidence of diminished capacity in the form of the Petitioner's bipolar disorder and to attempt to build a sympathetic profile of the Petitioner in order to humanize him before the jury. Ms. Shettles acknowledged that some of the themes she provided trial counsel were presented at trial, including the Petitioner's bipolar disorder, his childhood, and his good working skills. Trial counsel were able to present such themes despite the trial court's numerous warnings to trial counsel about opening the door to allow the State to question witnesses regarding the Oklahoma and Missouri murders.

The Petitioner asserts several memoranda were not used because Co-Counsel, who assumed the role of mitigation specialist, failed to understand the relevance to the Petitioner's mental illness. Dr. Caruso, however, testified at trial that the Petitioner had bipolar disorder and a personality disorder and that the disorders affected his behavior, judgment, and ability to control his impulses. Dr. Caruso further testified that the Petitioner's childhood trauma impacted the development of his disorder and contributed to the criminal offenses. As noted by the post-conviction court, "[t]he jury heard that [the] Petitioner's mother had little relationship with [the] [P]etitioner and heard about the abandonment of his father and step-mother. Testimony regarding prior manifestations of [the P]etitioner's illness was also placed before the jury." Any evidence regarding the Petitioner's bipolar disorder would have been cumulative to the evidence that had been presented during the penalty phase. There is no requirement that counsel present cumulative evidence during sentencing. *See Nichols v. State*, 90 S.W.3d 576, 601-02 (Tenn. 2002).

Although the Petitioner presented additional evidence of his social history at the post-conviction hearing through the testimony of his parents, the post-conviction court found that the Petitioner instructed his trial counsel that his mother was not to attend the trial and that his father could not be located or was uncooperative. Roxanne Evans testified at trial that

the Petitioner's parents chose not to attend the trial. Ms. Shettles testified regarding her efforts to convince the Petitioner's mother to attend the trial and the lack of cooperation from the Petitioner's father. Trial counsel cannot be faulted for the decisions of the Petitioner's parents. Further, trial counsel hired someone to research mitigation evidence in support of the Petitioner. Accordingly, The Petitioner is not entitled to relief on this issue.

### 4. Failure to Utilize the Defense Team in an Effective Manner

The Petitioner contends that, although trial counsel assembled a defense team, trial counsel failed to communicate and coordinate the activities of the team in an effective manner. The Petitioner avers that, as a result, trial counsel did not thoroughly interview a "wealth" of witnesses and presented a "bare bones" rendition of the mitigating evidence.

As we have held, however, any additional evidence regarding Petitioner's bipolar disorder would have been largely cumulative to the evidence that was presented during the penalty phase. Moreover, the Petitioner's parents, who testified at the post-conviction hearing, chose not to participate at trial. Further, as we previously held, the evidence presented at the post-conviction hearing by the neuropsychologist, while somewhat compelling, was not evidence that trial counsel was deficient for failing to present.

This is not a case in which trial counsel failed to conduct any inquiry into the Petitioner's background and social history. *See Williams v. Taylor*, 529 U.S. 362, 396 (2000). Rather, based upon their investigation, trial counsel determined the best mitigation defense was to show the effect of the Petitioner's bipolar disorder on his actions and to humanize him before the jury. Trial counsel also had the task of presenting such evidence in a way that they did not open the door to the State being able to question witnesses about the murders in Oklahoma and Missouri, a strategy that Rick Kammen, the Petitioner's own expert, could not fault. This was a matter of strategy on trial counsel's part, and we will not second guess that on appeal. *See Williams*, 599 S.W.2d at 279-80. Trial counsel did, in fact, present mitigating evidence to support the themes without opening the door to evidence of the Oklahoma and Missouri murders. Trial counsel were not ineffective in this regard.

### 5. Failure to Conduct Meaningful Voir Dire and Preserve Issues for Appeal

The Petitioner asserts that trial counsel were in effective in failing to exercise peremptory challenges to strike jurors Tonya Avery, Crystal Horner, Oma Warlick-Gardner, and Ovid Perkins. The Petitioner also contends trial counsel were ineffective for failing to adequately voir dire prospective jurors concerning their consideration of mitigation evidence. He argues that trial counsel were ineffective in failing to preserve for appeal the challenges for cause and the denial of the motion for change of venue. Finally, the Petitioner maintains

56

trial counsels' decisions regarding jury selection resulted in prejudice.

### a. Failure to Strike Jurors

The Petitioner avers that trial counsel were ineffective for failing to exercise peremptory challenges to strike jurors Tonya Avery, Crystal Horner, Oma Warlick-Gardner, and Ovid Perkins. He asserts those jurors were not qualified to sit on the jury due to their views of the death penalty. A criminal defendant is guaranteed the right to an impartial jury by both the United States and Tennessee Constitutions. *See* U.S. Const. Amend. VI; Tenn. Const. art. I, § 9. Parties in both criminal and civil cases are granted "an absolute right to examine prospective jurors" in an effort to determine that they are competent. *State v. Kiser*, 284 S.W.3d 227, 279 (Tenn. 2009); *see* T.C.A. § 22-3-101. Jurors "who will automatically vote for the death penalty" are subject to removal for cause just as jurors who refuse to consider the death penalty. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). In determining when a prospective juror may be excused for cause because of his or her views on the death penalty, the standard is "whether the juror's views would substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). The Supreme Court further observed that "this standard likewise does not require that a juror's biases be proved with 'unmistakable clarity.'" *Id.* However, the trial court must have the "definite impression" that a prospective juror cannot follow the law. *State v. Austin*, 87 S.W.3d 447, 473 (Tenn. 2002). "[I]rrespective of whether the trial judge should have excluded . . . [a] challenged [juror] for cause, any error in this regard is harmless unless the jury who heard the case was not fair and impartial." *Howell*, 868 S.W.2d at 248 (citing *State v. Thompson*, 768 S.W.2d 239, 246 (Tenn. 1989)).

### i. Tonya Avery

Prior to individual voir dire, Ms. Avery indicated she felt the Petitioner was guilty. During individual voir dire, however, Ms. Avery stated she understood the State bore the burden of proving first degree murder and that if she believed the State failed to prove first degree murder and proved voluntary manslaughter instead, she would "stick to [her] guns" and only vote for a manslaughter conviction. Upon being questioned by trial counsel, Ms. Avery stated she believed in "eye-for-an-eye," and she would be unable to seriously consider a sentence of life or life without parole. On voir dire by the State, however, Ms. Avery stated she would not impose a sentence of death if the State failed to prove an aggravating circumstance beyond a reasonable doubt if instructed by the trial court. The trial court denied trial counsel's challenge for cause, and trial counsel did not exercise a peremptory challenge to strike Ms. Avery from the jury.

Ms. Avery stated that, in considering punishment for first degree murder, she would follow the law as instructed by the trial court and require the State to carry its burden of proof during both the guilt/innocence and penalty phases. Such evidence does not establish Ms. Avery would automatically vote for the death penalty upon a conviction for first degree murder. Ms. Avery was qualified to serve as a juror in the Petitioner's trial.

Moreover, the post-conviction court found trial counsel made a strategic decision not to utilize additional peremptory challenges. Both Counsel and Co-Counsel testified that they thought the jurors empaneled on the jury were more likely to decline to sentence the Petitioner to death than the jurors remaining in the jury pool. Reviewing courts must indulge a strong presumption that trial counsel's conduct falls within the range of reasonable professional assistance. *Strickland*, 466 U.S. at 689. Deference will be paid to sound trial strategy that is based upon adequate preparation. *Hellard*, 629 S.W.2d at 9. As our Supreme Court has stated:

> "[h]indsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

*Id.* (quoting *Robinson v. United States*, 448 F.2d 1255, 1256 (8th Cir. 1971)). "It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics." *Id.*

Before exercising any peremptory challenge, trial counsel consulted with a jury specialist, reviewed questionnaires completed by every prospective juror, and conducted individual voir dire of each prospective juror. Counsel testified he was aware of the trial judge's procedure in determining which juror would replace the juror excused by Counsel's exercise of a peremptory challenge. When Counsel compared that prospective juror to those who were seated in the jury box, he determined that the ones seated on the jury were better. Counsel testified "a lot of things go into the selection of the juror other than just black and white questions and answers,"including facial expressions and demeanor. After utilizing these resources, trial counsel determined the panel that was seated was more favorable to the Petitioner than the prospective jurors remaining in the jury pool. Because Ms. Avery was qualified to sit on the jury and trial counsel's decision to refrain from exercising a peremptory challenge to strike her from the jury was a sound trial strategy based upon adequate preparation, the Petitioner has not proven that his trial counsel was ineffective. Further, he cannot prove that he was prejudiced because he has not proven that the jury that decided his case was not "fair and impartial." *See State v. Howell*, 868 S.W.2d 238, 248

(Tenn. 1993). The Petitioner is not entitled to relief on this issue.

### ii. Crystal Horner

The Petitioner next contends juror Crystal Horner was not qualified to sit on the jury and that his trial counsel erred when they did not exercise a peremptory strike to excuse her. During voir dire, Ms. Horner testified that her husband's uncle worked on vehicles at another garage in Dyersburg and that she discussed the case with her husband. Ms. Horner stated she could set aside anything her husband told her about the conversation. She affirmed she could decide the case based upon the evidence and the law. Ms. Horner testified she did not have any strong religious, political, social, or moral beliefs about the death penalty. She had no opinion regarding whether the death penalty was imposed too frequently or not enough. Ms. Horner stated she believed anyone convicted of first degree murder should automatically be given the death penalty. She further stated she would vote for a lesser-included offense of first-degree murder if the proof and the law dictated it. Ms. Horner maintained she would follow the law regardless of whether she wanted to do so. She stated she believed that prison was like a "country club atmosphere." The trial court denied Petitioner's motion to strike Ms. Horner for cause, and trial counsel did not exercise a peremptory challenge to remove Ms. Horner from the jury.

The Petitioner argues Ms. Horner was not qualified to sit on the jury based upon her views of the death penalty. Ms. Horner's answers to the questions posed during voir dire, however, fail to establish her views on the death penalty "would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath." *Witt*, 469 U.S. at 424 (internal quotation marks omitted). Ms. Horner did state she believed the death penalty should be automatically imposed upon a conviction for first degree murder. She, however, also stated she did not have strong beliefs regarding the death penalty, and she would follow the law regardless of whether she wanted to do so. An assessment of a juror's ability to adhere to her oath is based upon not only the answers posed by counsel but also nonverbal responses. *State v. Odom*, 336 S.W.3d 541, 559 (Tenn. 2011). The trial court observed Ms. Horner's responses to the questions presented and refused to strike her for cause. The record does not establish Ms. Horner would not have followed the requirements of the law as instructed by the trial court. Moreover, after considering advice from a jury specialist, the responses to the questionnaires, and the responses of each potential juror, trial counsel made a strategic decision to keep Ms. Horner on the jury based upon their belief that she would be a better juror than those who remained in the jury pool. Trial counsel were not ineffective in this regard. The Petitioner is not entitled to relief on this issue.

### iii. Oma Warlick Gardner

59

The Petitioner next asserts Ms. Gardner was not qualified to sit on the jury and that trial counsel were ineffective for failing to exercise a peremptory strike to excuse her. Ms. Gardner testified she had not formulated an opinion on the case. She stated her experience working at a correctional complex would not make her favor the State over the Petitioner. Ms. Gardner further stated she did not believe that the death penalty was a deterrent but that she considered life without parole to be a deterrent. She also believed lethal injection was a worse sentence than life without parole. Ms. Gardner testified that the death penalty should be used more often and that if someone was proven guilty of first degree murder, he or she should automatically receive the death penalty. Upon further questioning by the trial court, Ms. Gardner stated she could follow the law as instructed by the trial court and would impose a sentence of life or life without parole if appropriate. The trial court denied the Petitioner's challenge for cause, and trial counsel did not exercise a peremptory challenge to remove Ms. Gardner from the jury.

Although Ms. Gardner first indicated that she believed the death penalty should be imposed automatically upon conviction of first degree murder, the trial court rehabilitated her through further questioning. Moreover, as previously noted, trial counsel determined that the jurors who remained on the jury were more favorable to the Petitioner than those who were left in the jury pool. Trial counsel was not ineffective for failing to exercise a peremptory challenge, and the Petitioner is not entitled to relief on this issue.

### iv. Ovid Perkins

The Petitioner asserts that Ovid Perkins was not qualified to sit on the jury and that trial counsel were ineffective for failing to exercise a peremptory challenge to excuse him. During voir dire, Mr. Perkins testified he did not recall hearing about the case. He stated he understood that the State has the burden of proving guilt of first degree murder beyond a reasonable doubt and that the Petitioner is not required to prove anything. Mr. Perkins explained he is "not really for or against" the death penalty. He stated he could follow the law as instructed by the trial court and he could not make a decision of life, life without parole, or death without first hearing the facts. Mr. Perkins further stated the only circumstance in which he believed that the death penalty should be automatic is "cold, premeditated murder." Trial counsel did not challenge Mr. Perkins for cause and did not exercise a peremptory challenge to remove him from the jury.

The Petitioner maintains on appeal that Mr. Perkins was not qualified to serve on the jury due to his beliefs about the death penalty. Although Mr. Perkins stated he believed that the death penalty should be automatically imposed in cases of "cold, premeditated murder," he also stated he did not have strong beliefs regarding the death penalty, he would follow the law as instructed by the trial court, and he could consider all three forms of punishment after

60

hearing the facts. Mr. Perkins's answers to the questions posed during voir dire fail to establish that his views on the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (internal quotation marks omitted). Moreover, as previously noted, trial counsel determined that the jurors who remained on the jury were more favorable to Petitioner than those who were left in the jury pool. Trial counsel were not ineffective in failing to challenge Mr. Perkins for cause or in failing to exercise a peremptory challenge to strike him from the jury. The Petitioner is not entitled to relief on this issue.

### b. Failure to Conduct Meaningful Voir Dire

The Petitioner contends trial counsel failed to adequately question prospective jurors during voir dire concerning their consideration of mitigation evidence. The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. *State v. Mann*, 959 S.W.2d 503, 533 (Tenn. 1997). There is no constitutional right that a defendant is entitled to have questions posed to the venire specifically directed to matters that conceivably might prejudice veniremen against him. *Ristaino v. Ross*, 424 U.S. 589, 594 (1976) (citing *Ham v. South Carolina*, 409 U.S. 524, 527-28 (1973)). Moreover, in the capital murder context, where the jury in the penalty phase must choose between life and death, several courts have held that failing to question whether a prospective juror can fairly consider a life sentence does not necessarily constitute deficient performance. *Hartman v. State*, 896 S.W.2d 94, 105 (Tenn. 1995); *see Stanford v. Parker*, 266 F.3d 442, 453-54 (6th Cir. 2001); *Commonwealth v. Morris*, 684 A.2d 1037, 1042-43 (Pa. 1996).

The failure to make certain inquiries to determine how receptive the jury would be to specific mitigation factors during voir dire does not necessarily constitute ineffective assistance of counsel. *See generally State v. Goodwin*, 703 N.E.2d 1251, 1257 (Ohio 1999). The scope of voir dire is a tactical decision. *See Butler v. State*, 789 S.W.2d 898, 901 (Tenn. 1990). It is not within the province of the court to second-guess strategic or tactical choices made by trial counsel. *Id.* at 900.

Based upon our review of the transcript of voir dire and the entire record, we cannot conclude that the Petitioner has proven that he is entitled to post-conviction relief on this basis. The jurors were questioned as to their ability to follow the law. The trial court instructed the jury of the applicable legal burdens and on mitigating circumstances. "[W]here a juror is not legally disqualified or there is no inherent prejudice, the burden is on the [d]efendant to show that a juror is in some way biased or prejudiced." *State v. Caughron*, 855 S.W.2d 526, 539 (Tenn. 1993). The Petitioner has offered no evidence to establish that the jury ultimately empaneled was biased or unfair. The Petitioner is not entitled to relief on this claim.

### c. Failure to Preserve for Appeal the Denial of Challenges for Cause

The Petitioner alleges the trial court's denial of trial counsel's challenges of jurors for cause constituted structural error that warranted the reversal of the Petitioner's conviction and sentence. The Petitioner argues that by failing to use peremptory challenges to dismiss these jurors, trial counsel failed to preserve the issue for appeal.

"[O]nly where a defendant exhausts all of his peremptory challenges and is therefore forced to accept an incompetent juror can a complaint about the jury have merit." *State v. Coury*, 697 S.W.2d 373, 379 (Tenn. Crim. App. 1985) (citing *Hale v. State*, 198 Tenn. 461, 281 S.W.2d 51 (Tenn. 1955); *McCook v. State*, 555 S.W.2d 411, 413 (Tenn. Crim. App. 1977)). As previously stated, the jurors about whom the Petitioner complains were qualified to sit on the jury, and the trial court properly denied trial counsel's challenge for cause as to these jurors. As the post-conviction court found, trial counsel made a strategic decision not to utilize additional peremptory challenges. Counsel testified that, at the time of voir dire, he was not concerned with preserving the jury issue for appeal but was instead focused on attempting to seat a jury that would impose a sentence less than death. This was the proper focus for trial counsel, who determined the jury panel seated was more favorable to the Petitioner than those prospective jurors who remained in the jury pool. The Petitioner is not entitled to relief on this issue.

### d. Failure to Preserve for Appeal the Denial of a Change of Venue

The Petitioner contends trial counsel were ineffective in failing to use all peremptory challenges in order to preserve for appeal the denial of his motion for change of venue from Lake County. Trial counsel's failure to exercise all peremptory challenges was the result of a well-reasoned strategic decision that the panel seated was more favorable to the Petitioner than those who remained in the jury pool. In addition to noting the failure to exercise all peremptory challenges, this Court held on direct appeal that,

> despite his argument that the extensive and "sensational" coverage by the media denied him a fair trial, the defendant has failed to direct this Court to any specific portion of the record, in particular the voir dire examination of the jurors, indicating the biased character of the jurors actually selected. One who is reasonably suspected of murder cannot expect to remain anonymous. With consideration of the defendant's failure to exhaust all peremptory challenges, the careful supervision of voir dire by the trial court, and the assertion by the jurors that they could and would give the defendant a fair and impartial trial, we cannot conclude that the trial court abused its discretion in removing the case to Lake County.

*Thacker*, 164 S.W.3d at 238 (appendix). Thus, trial counsel's failure to exercise all peremptory challenges was only one factor in the Court upholding the trial court's denial of Petitioner's motion for an additional change of venue. The Court would not have reached a different conclusion had trial counsel utilized all of their peremptory challenges. The Petitioner is not entitled to relief on this issue.

### e. Prejudice

The Petitioner maintains trial counsel's failure to strike unqualified jurors and failure to preserve jury selection issues for appeal was prejudicial. The Petitioner contends the failure to strike an unqualified juror is not subject to harmless error analysis and that prejudice is presumed. We have held, however, that the jurors about whom the Petitioner complains were qualified to sit as jurors in the Petitioner's trial. This issue is without merit.

### 6. Failure to Present Social History Evidence

The Petitioner next contends trial counsel were ineffective in failing to call his parents, Ray Thacker and Lillian Johnston, as witnesses during the penalty phase of trial. During the post-conviction hearing, Ms. Shettles testified she attempted, but was unable, to contact Mr. Thacker, and she learned from other family members that Mr. Thacker did not want to see or meet with her. When Mr. Thacker testified at the post-conviction hearing, he stated that the FBI came to his home in late 1999 and told him the Petitioner was wanted for murder. The Petitioner's sister had been informed that Mr. Thacker had been captured in Dyersburg, Tennessee, but Mr. Thacker made no attempt to contact the Petitioner. Further, he denied knowledge that his wife sent the Petitioner a letter saying that she and Mr. Thacker could not assist the Petitioner. Mr. Thacker conceded he was not surprised that the Petitioner had informed an investigator that they had a bad relationship. While Mr. Thacker maintained their relationship was close, he was unaware the Petitioner was married and living in Oklahoma in December 1999. Although Mr. Thacker contended he would have cooperated and testified for the Petitioner had he been notified, the post-conviction court found otherwise. The evidence does not preponderate against the trial court's finding, and we conclude trial counsel was not ineffective in this regard.

With regard to the Petitioner's mother, Ms. Shettles testified she interviewed the Petitioner's mother, Ms. Johnston, who was not comfortable about relating information that reflected poorly upon her, her background, or her treatment of her children. Ms. Johnston informed Ms. Shettles that the Petitioner had requested she not attend the trial and that she intended to honor that request. Despite Ms. Shettles discussions with her about attending the trial, Ms. Johnston refused to attend. We cannot conclude that trial counsel were deficient in not presenting the testimony of an uncooperative witness who refused to attend the trial.

63

We further conclude that the Petitioner cannot prove that he was prejudiced by the these two witnesses failing to testify. Evidence of the Petitioner's unstable childhood and his struggles with mental illness were presented through other witnesses during the penalty phase. Evidence of the aggravating factors were strong, and any additional details that may have been presented would not have significantly added to the mitigation proof that was presented at trial. Thus, the Petitioner is not entitled to relief on this issue.

Petitioner also faults trial counsel's failure to utilize the document created by Ms. Shettles called "Steven's Bridge," which outlined the factors that the Petitioner claims converged in his life to cause him to commit the murder. As the post-conviction court found, much of the evidence included in the document was presented during the penalty phase through the testimony of other witnesses. The document would not have significantly added to the mitigation proof that was presented at trial. The Petitioner is not entitled to relief on this issue.

### 7. Failure to Present a Cohesive Theory of Defense

The Petitioner contends trial counsel were ineffective in presenting proof during the penalty phase that the death penalty was less expensive than life in prison. He further asserts they were ineffective for asserting self defense when it was not supported by the evidence.

During general voir dire, Co-Counsel asked the jurors, "Now, how many of you, before today, knew that it, for instance, cost [sic] more to–for the State of Tennessee to execute someone than it does for them to be kept for the rest of their life, in prison?" When the State objected, Co-Counsel explained they planned to present such evidence. During the penalty phase, trial counsel called Ms. Shettles, who testified that from 1976 to 1990, she was employed as a parole officer in Memphis and supervised the office for several years. Ms. Shettles stated she was familiar with the various costs associated with the incarceration of inmates in Tennessee and that, as a supervisor of the parole office in Memphis, she determined whether a distinction existed between the costs of housing an inmate for life and the costs of imposing the death penalty. Ms. Shettles explained there is such little distinction in cost that the Department of Correction does not separate in their budget the daily costs of housing a prisoner on death row from the daily costs of housing a maximum security prisoner. On cross-examination, Ms. Shettles stated she assumed a prisoner incarcerated on death row for four years would be considerably less expensive than a prisoner incarcerated in a maximum security prison for fifty years.

The post-conviction court found trial counsel's decision to present Ms. Shettles's testimony was a sound tactical decision. The fact that the prosecutor was prepared to rebut the testimony does not mean trial counsel were ineffective in presenting such evidence. *See*

*Goad*, 938 S.W.2d at 369 (noting that the fact that a particular strategy or tactical decision failed does not alone establish ineffective assistance of counsel). Moreover, the Petitioner was not prejudiced by Ms. Shettles's testimony. Evidence supporting the aggravating factors was strong. It is not reasonably probable that the jury would have rendered a different verdict had they either not heard from Ms. Shettles or heard a more detailed explanation of the costs of incarcerating prisoners on death row. The Petitioner is not entitled to relief on this issue.

The Petitioner argues trial counsel were ineffective in asserting a theory of self-defense as the defense was not supported by the evidence. Prior to trial, Dr. Caruso examined the Petitioner and submitted a report to trial counsel in which he opined that, although the Petitioner suffered from a severe mental disease, neither an insanity defense nor a claim of diminished capacity could be supported. Without an expert to testify that the Petitioner was incapable as a result of his mental illness from forming the requisite mens rea for first degree murder, trial counsel could not reasonably rely upon a claim of diminished capacity. *See State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997). Rather, trial counsel made a strategic decision to present a theory of self-defense based upon evidence that the victim was known to carry a gun, as well as the rendition of evidence provided by the Petitioner to Counsel. The fact that the self-defense claim was unsuccessful does not mean that trial counsel were ineffective. *See Goad*, 938 S.W.2d at 369. The Petitioner is not entitled to relief on this issue.

### 8. Failure to Object to and Request Specific Jury Instructions

The Petitioner contends trial counsel were ineffective in failing to object to the jury instruction that a unanimous verdict is necessary in order for the Petitioner to receive a life sentence and/or life without the possibility of parole. On direct appeal, the Tennessee Supreme Court adopted this Court's holding that the trial court properly instructed the jury in accordance with Tennessee Code Annotated section 39-13-204(f)(1), (f)(2), and (g)(1). *Thacker*, 164 S.W.3d at 250-51 (appendix). Furthermore, the argument that this jury instruction is erroneous has been rejected. *See State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994); *State v. Thompson,* 768 S.W.2d 239, 250 (Tenn. 1989).

The Petitioner contends trial counsel erred in failing to object during both the guilt/innocence and penalty phases to the trial court's instruction on reasonable doubt with regard to the language that "absolute certainty is not demanded by law." This language has previously been upheld. *See State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008). The Petitioner also takes issue with the "moral certainty" language that was included in the reasonable doubt instruction in the penalty phase. Challenges to this language have also been rejected. *See State v. Nichols*, 877 S.W.2d 722, 734 (Tenn. 1994); *Pettyjohn v. State*, 885

S.W.2d 364, 365-66 (Tenn. Crim. App. 1994).

The Petitioner challenges trial counsel's failure to object to the instruction defining "intentionally" as it related to first degree murder as meaning that "a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is in the person's conscious objective or desire to engage in the conduct *or* cause the result." The Petitioner avers the effect of the disjunctive phrasing allows a person who consciously engages in conduct to be found to have consciously caused the result. In *State v. Page*, 81 S.W.3d 781 (Tenn. Crim. App. 2002), this Court analyzed this definition and the significance of the "or" language. *Page* was decided on April 16, 2002, more than two months after the Petitioner's trial, and, therefore, trial counsel were not on notice of the viability of the claim in Tennessee. Trial counsel were not deficient in failing to object to the instruction. *See William R. Stevens v. State*, No. M2005-00096-CCA-R3-PD, 2006 WL 3831264, at *33 (Tenn. Crim. App., at Nashville, Dec. 29, 2006), *perm. app. denied* (Tenn. May 21, 2007). The Petitioner also challenges trial counsel's failure to object to the jury instruction defining "recklessly" and to the instruction on theft, which incorporated definitions of "intentionally" and "knowingly" on the same basis. The Petitioner is not entitled to relief on this issue.

The Petitioner maintains trial counsel erred in not objecting to the sequential verdict instruction requiring the jury to first acquit on premeditated first degree murder before considering lesser-included offenses. This Court has repeatedly upheld "acquittal-first" instructions. *See State v. Raines*, 882 S.W.2d 376, 381-82 (Tenn. Crim. App. 1994); *State v. Rutherford*, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993).

The Petitioner contends trial counsel were deficient in failing to request an instruction concerning the consequences of the failure to agree on the penalty and an instruction informing the jury that the guilt phase verdict would not be affected if they failed to agree on a sentence. Tennessee courts have rejected the argument that constitutional standards require that a jury be instructed on the effect of a non-unanimous verdict at sentencing. *See Brimmer*, 876 S.W.2d at 86-87.

The Petitioner challenges trial counsel's failure to object to instructions that the jury could consider victim impact evidence in determining the "appropriate punishment" and the "appropriateness of death." He argues such an instruction created a presumption that death or life without parole is the appropriate sentence and shifted the burden to the Petitioner to prove through mitigating evidence that such a sentence is not appropriate. The Petitioner further argues the instruction allowed the jury to consider an impermissible non-statutory aggravating circumstance. The instruction on victim impact evidence used in this case has been approved by the Tennessee Supreme Court. *See State v. Reid*, 91 S.W.3d 247, 282-83 (Tenn. 2002); *State v. Nesbit*, 978 S.W.2d 872, 892 (Tenn. 1998).

66

The Petitioner faults trial counsel for failing to object to the trial court's instruction that the jury could consider only mitigation evidence that was "favorable" to the Petitioner. The trial record reveals that the jury was also instructed that "Tennessee law provides that in arriving at the punishment, the jury shall consider, as previously indicated, any mitigating circumstances raised by the evidence." The jury was not precluded from considering mitigating evidence by the charge given. The Petitioner is not entitled to relief on this issue.

## B. Ineffective Assistance of Counsel on Appeal

The Petitioner asserts Counsel was ineffective on appeal for failing to raise issues regarding "trial counsel's woefully inadequate voir dire," the trial court's denial of challenges of jurors for cause, and the constitutionality of the death penalty. The same principles apply in determining the effectiveness of both trial and appellate counsel. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must present facts that establish: (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal; and (2) absent counsel's deficient performance, there was a reasonable probability that Petitioner's appeal would have been successful before the state's highest court. *See e.g., Smith v. Robbins*, 528 U.S. 259, 285 (2000); *Aparico v. Artuz*, 269 F.3d 78, 95 (2d Cir. 2001); *Mayo v. Henderson*, 13 F.3d 528, 533-34 (2d Cir. 1994). In examining whether counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." *Id.* When an omitted issue is without merit, the Petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. *Id.* at 887-88.

Counsel is responsible for determining the issues to present on appeal. *State v. Matson*, 729 S.W.2d 281, 282 (Tenn. Crim. App. 1986). This responsibility addresses itself to the professional judgment and sound discretion of appellate counsel. *Porterfield v. State*, 897 S.W.2d 672, 678 (Tenn. 1995). There is no constitutional requirement that every conceivable issue be raised on appeal. *Campbell*, 904 S.W.2d at 597. The determination of which issues to raise is a tactical or strategic choice. *Id.*

The issue regarding trial counsel's voir dire is essentially a claim of ineffective assistance of counsel, which is generally more appropriately raised in a petition for post-conviction relief rather than on direct appeal. *See State v. Carruthers*, 35 S.W.3d 516, 551 (Tenn. 2000); *see also State v. Anderson*, 835 S.W.2d 600, 606 (Tenn. Crim. App. 1992) ("Raising issues pertaining to the ineffective assistance of counsel for the first time [on direct appeal] in the appellate court is a practice fraught with peril.").

Moreover, we have held that trial counsel was not ineffective during voir dire and that the jurors whom the Petitioner contends were unqualified, were, in fact, qualified to sit as jurors at the Petitioner's trial. Therefore, Counsel was not ineffective in failing to preserve this issue on appeal by exercising peremptory challenges. The Petitioner also claims that Counsel was ineffective during oral argument before the appellate courts. The Petitioner has failed to present facts sufficient to establish that Counsel was deficient in arguing the appeal or that any deficiency resulted in prejudice. The Petitioner is not entitled to relief on this issue.

Finally, the Petitioner asserts that Counsel was ineffective in failing to challenge the constitutionality of the death penalty. Specifically, the Petitioner claims Counsel was ineffective in failing to argue the following:

1. The death penalty statute vests unfettered discretion as to whether to seek the death penalty in the prosecutor. This argument has been rejected. *See State v. Hines*, 919 S.W.2d 573, 582 (Tenn. 1995); *State v. Brimmer*, 876 S.W.2d 75, 87 (Tenn. 1994). The Petitioner contends the unlimited discretion of the thirty-one elected District Attorneys General violates principles set out in *Bush v. Gore*, 531 U.S. 98 (2000). This Court has previously considered and rejected this claim. *See David Keen v. State*, No. W2004-02159-CCA-R3-PD, 2006 WL 1540258 (Tenn. Crim. App., at Jackson, June 5, 2006), *perm. to appeal denied* (Tenn. 2006). This issue is without merit.

2. Lethal injection violates the cruel and unusual punishment clauses of the federal and state constitutions. The Tennessee Supreme Court has considered this claim and determined that Tennessee's lethal injection protocol is consistent with both contemporary standards of decency and the overwhelming majority of lethal injection protocols used by other states and the federal government. *Abdur' Rahman v. Bredesen*, 181 S.W.3d 292, 306-07 (Tenn. 2005). On April 16, 2008, the United States Supreme Court affirmed the use of the three-drug protocol which Kentucky used in its lethal injection procedure. *Baze v. Rees*, 553 U.S. 35 (2008). Tennessee uses the same protocol as Kentucky. *Id.* (citing *Workman v. Bredesen*, 486 F.3d 896, 902 (6th Cir. 2007)). This issue is without merit.

3. The death sentence violates the Petitioner's fundamental right to life, and the imposition of the death penalty is not necessary to promote a compelling State interest. This complaint is contrary to settle precedent as reflected in *Cauthern v. State*, 145 S.W.3d 571, 629 (Tenn. 2004). This issue is without merit.

4. The indictment returned by the grand jury was insufficient as it failed to include the aggravating factors that rendered Petitioner eligible for the death penalty. The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating

circumstances need not be pled in the indictment. *State v. Reid*, 164 S.W.3d 286, 312 (Tenn. 2005); *State v. Berry*, 141 S.W.3d 549, 562 (Tenn. 2004); *State v. Holton*, 126 S.W.3d 845, 863 (Tenn. 2004). This issue is without merit.

Because these issues are without merit, Counsel was not ineffective in failing to raise them on direct appeal.

## C. Constitutionality of Death Penalty

The Petitioner raises the issues regarding the constitutionality of the death penalty as free standing claims. We agree with the State that these claims should have been raised in prior proceedings. Accordingly, Petitioner's claims are waived. *See* T.C.A. § 40-30-106(g). Further, as we stated above, the issues were without merit. The Petitioner is not entitled to relief on these issue.

## D. Finding of Prejudice

The Petitioner contends that the post-conviction court erred when it determined that the "proof of the aggravating circumstances was strong and any additional details about [the P]etitioner's childhood that may have been presented or any additional explanation or analysis by Dr. Caruso that may have been offered would likely not have added significantly to the mitigation that was actually presented at trial." He also takes issue with the post-conviction court's finding that the evidence in "Steven's Bridge" was not "so powerful or persuasive as to have caused the jury to reach a different verdict." The Petitioner goes on to state that the aggravating factors in his case are not dispositive of the question of whether he was prejudiced by Counsel's deficient performance.

In order to be entitled to post-conviction relief, the Petitioner must prove by clear and convincing evidence that his trial counsel were ineffective and that he was prejudiced by their performance. *See Strickland*, 466 U.S. at 687. The Petitioner is correct that the aggravating factors in his case are not dispositive of the question of whether he was prejudiced, but they are a relevant consideration. He must prove by clear and convincing evidence that "'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death.'" *Henley*, 960 S.W.2d at 579-80 (quoting *Strickland*, 466 U.S. at 695). The post-conviction court properly engaged in this inquiry, and the Petitioner is not entitled to relief on this issue.

## E. Cumulative Effect of Errors

The Petitioner asserts trial counsels' performance was constitutionally deficient based upon the cumulative effect of the errors. We conclude the Petitioner's trial counsel were only ineffective for failing to communicate effectively with Dr. Caurso, but we conclude that the Petitioner was not prejudiced by this error. As trial counsel were not ineffective in any other way, the Petitioner is not entitled to relief based upon any cumulative effect of other errors. The Petitioner is not entitled to relief on this issue.

### III. Conclusion

Based upon the foregoing reasoning and applicable authorities, we conclude that the post-conviction court did not err when it denied post-conviction relief. Accordingly, we affirm the judgment of the post-conviction court.

_____

ROBERT W. WEDEMEYER, JUDGE